IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| METROPCS WIRELESS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09–CV–00601–WDQ |
| | ) | |
| TELECOMMUNICATION SYSTEMS, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF METROPCS WIRELESS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, TO STAY**

**FULBRIGHT & JAWORSKI L.L.P.**

Matthew H. Kirtland
Md. State Bar No. 26089
801 Pennsylvania Avenue, N.W.
Washington, DC 20004-2623
Telephone:  202.662.0200
Facsimile:  202.662.4643
E–mail:  mkirtland@fulbright.com

**FULBRIGHT & JAWORSKI L.L.P.**

Brett C. Govett
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:  214.855.8000
Facsimile:  214.855.8200
E–mail:  bgovett@fulbright.com

*Counsel for Plaintiff, MetroPCS Wireless, Inc.*

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 1

    I.    TCS Enters Into the 11/12/07 Network Services Agreement to Provide Location-Based Services to MetroPCS ........................................................................ 1

    II.    EMSAT Advanced Geo-Location Technology, LLC and Location Based Services LLC File Suit Against MetroPCS and Other Defendants in the United States District Court for the Eastern District of Texas, Alleging that MetroPCS' Provision of Location-Based Services to Its Customers Infringes the Patents-in-Suit .................................................................................................................. 3

    III.    Shortly After the Patent Infringement Action Is Filed, MetroPCS Asks TCS to Defend and Indemnify It Against the Patent Infringement Action in Accordance With Section 7.4 of the Network Services Agreement, But TCS Flatly Rejects MetroPCS' Request ................................................................................. 4

    IV.    MetroPCS Files the Present Action Seeking Enforcement of TCS' Duty to Defend and Duty to Indemnify Under Section 7.4 of the Network Services Agreement ............. 5

ARGUMENT ...................................................................................................................... 6

    I.    TCS' Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) Should Be Denied............................................................................................................. 6

        A.    The Patent Infringement Action Falls Squarely Within the Scope of Section 7.4 of the Network Services Agreement ................................................... 6

        B.    MetroPCS' Claims Are Not Premature............................................................. 13

            1.    MetroPCS' Declaratory Judgment Action Seeking Enforcement of TCS' Duty to Defend, Indemnify, and Hold Harmless Is Not Premature ..................................................................................................... 14

            2.    Alternatively, This Court Can Enter a Conditional Judgment on MetroPCS' Claims Seeking Enforcement of TCS' Duty to Defend, Indemnify, and Hold Harmless ................................................................. 16

## TABLE OF CONTENTS

**PAGE**

3.    MetroPCS' Claims Seeking Enforcement of TCS' Duty to Defend Are Not Premature ................................................................................. 19

II.    TCS' "First Alternative" Arbitration Argument Is a Nonstarter ..................................... 23

A.    The *Sine Qua Non* For Compelled Arbitration Is An Actual Agreement To Arbitrate The Dispute At Issue ........................................................................... 23

B.    There Is No Arbitration Agreement Governing The 2007 Network Services Agreement – In Fact, The Parties Expressly Agreed That Disputes Would Be Resolved Through Litigation To Be Filed In New York City Or Maryland ...................................................................................... 24

1.    Section 9.10 – The Choice of Law and Litigation Forum Selection Clause ................................................................................ 25

2.    Sections 9.2 and 9.3 – The Non–Binding Conciliation and Supplemental Litigation Forum Selection Clauses .................................. 25

3.    Section 9.11 – The Integration Clause .................................................... 26

C.    The Separate 2003 And 2007 Agreements Relate To Entirely Different Services And The Texas Plaintiffs Assert That Different Patents Are Infringed By The Different Services — Importantly, The Arbitration Clause In The 2003 Emergency 9-1-1 Agreement States That It Is Limited "To This Agreement" Only ................................................................................. 27

D.    Defendant TCS' "Significant Relationship" Cases Are Inapposite – None Deal With Successive Agreements, Four Years Separated, Covering Separate And Distinct Services With One Agreement Calling For Arbitration And The Latter One Disclaiming It .................................................. 28

E.    TCS' Speculative "Efficiency" and "Consistency" Arguments Are Wide Of The Mark And Cannot Substitute For The Requirement Of An Actual Agreement To Arbitrate Disputes Under The Network Services Agreement .................................................................................................... 32

III.    TCS' Terse, "Second Alternative" Request For An Indefinite Stay Should Also Be Denied .................................................................................................................. 33

ii

## TABLE OF CONTENTS

**PAGE**

    A.    TCS' Case Authorities Demonstrate That Stay Relief Is *Not* Appropriate Here ................................................................................................................... 33

    B.    The Separate Arbitration On The 2003 Emergency 9-1-1 Agreement Cannot Lawfully Impede This Court's Determination Of The Issues Relative To The Separate 2007 Network Services Agreement ........................... 38

OBJECTIONS, RESERVATIONS AND PRAYER ............................................................. 38

CERTIFICATE OF SERVICE .......................................................................................... 41

| Exhibit Tab | Description |
|---|---|
| 1 | Original Complaint in C.A. No. 1:09-CV-00601-WDQ; *MetroPCS Wireless, Inc. v. Telecommunication Systems, Inc.*; In the United States District Court for the District of Maryland (Northern Division) |
| 2 | Declaration of Malcolm M. Lorang |
| 3 | Network Services Agreement dated November 12, 2007 between MetroPCS and TCS |
| 4 | Original Complaint dated October 7, 2008 filed in Civil Action No. 2:08-CV-381; EMSAT Advanced Geo-Location Technology, LLC and Location Based Services LLC v. MetroPCS Communications, Inc., MetroPCS Wireless, Inc., et al.; In the United States District Court for the Eastern District of Texas as well as Exhibit A (U.S. Patent No. 5,946,611), Exhibit B (U.S. Patent No. 6,847,822), and Exhibit C (U.S. Patent No. 7,289,763) to that pleading |
| 5 | October 21, 2008 letter from J. Christopher Luna to TCS |
| 6 | TCS' 11/5/08 letter to J. Christopher Luna |
| 7 | Declaration of J. Christopher Luna |

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adkins v. Labor Ready, Inc.*,
     303 F.3d 496 (4th Cir. 2002) ...................................................................24

*Agostini Bros. Bldg. Corp. v. United States*,
     142 F.2d 854 (4th Cir. 1994) ...................................................................37

*Am. Home Assurance Co. v. Vecco Concrete Constr. Co., Inc.*,
     629 F.2d 961 (4th Cir. 1980) ............................................................24, 37

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*,
     96 F.3d 88 (4th Cir. 1996) ...............................................................29, 33

*Auto. Ins. Co. of Hartford v. Cook*,
     850 N.E.2d 1152 (N.Y. 2006)..................................................................19

*Bernhardt v. Polygraphic Co.*,
     350 U.S. 198, 76 S. Ct. 273, 100 L. Ed. 199 (1956)................................24

*Blair v. County of Albany*,
     127 A.D.2d 950 (N.Y. App. Div. 1987) ..................................................18

*Cara's Notions, Inc. v. Hallmark Cards, Inc.*,
     140 F.3d 566 (4th Cir. 1998) ............................................................30, 31

*Citywide Auto Leasing, Inc. v. City of New York*,
     294 A.D.2d 528 (N.Y. App. Div. 2002) ............................................14, 15

*Climax Molybdenum Co. v. M/V Seatrain Antwerp*,
     51 B.R. 192 (D. Md. 1984) ...............................................................35, 36

*Dean Witter Reynolds v. Byrd*,
     470 U.S. 213, 105 S. Ct. 1238 (1985)......................................................32

*First Options of Chicago, Inc. v. Kaplan*,
     514 U.S. 938, 115 S. Ct. 1920 (1995)................................................32, 33

*Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*,
     87 F.R.D. 53 (E.D. Pa. 1980)...................................................................34

*Hines v. D'Artois*,
     531 F.2d 726 (5th Cir. 1976) ...................................................................35

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79, 123 S. Ct. 588 (2002)................................................32

*In re Mid–Atlantic Toyota Antitrust Litig.*,
  92 F.R.D. 358 (D. Md. 1981).............................................33, 34, 35

*Inst. of Mission Helpers of Baltimore City v. Reliance Ins. Co.*,
  812 F. Supp. 72 (D. Md. 1992).........................................................37

*Johnson v. Manhattan Ry. Co.*,
  289 U.S. 479, 53 S. Ct. 721 (1933)...............................................32

*Landis v. N. Am. Co.*,
  299 U.S. 248, 57 S. Ct. 163, 81 L. Ed. 153 (1936)....................35

*Local 1351 Int'l. Longshoremens Ass'n v. Sea–Land Serv. Inc.*,
  214 F.3d 566 (5th Cir. 2000) ..........................................................32

*Long v. Silver*,
  248 F.3d 309 (4th Cir. 2001) .....................................................30, 31

*Martinez. v. Fiore*,
  454 N.Y.S.2d 475 (N.Y. App. Div. 1982) ..................................18

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
  312 U.S. 270, 61 S. Ct. 510 (1941).........................................14, 15

*McCleary v. City of Glens Falls*,
  32 A.D.3d 605 (N.Y. App. Div. 2006) .....................................22, 23

*O'Brien v. Key Bank N.A.*,
  223 A.D.2d 830 (N.Y. App. Div. 1996) .......................................17

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  128 S. Ct. 2109 (2008).....................................................................13

*Ruttenberg v. Davidge Data Sys. Corp.*,
  215 A.D.2d 191 (N.Y. App. Div. 1995) .......................................23

*State of New York v. Syracuse Rigging Co.*,
  249 A.D.2d 758 (N.Y. App. Div. 1998) .......................................17

*Sumba v. Clermont Park Assocs., LLC*,
  45 A.D.3d 671 (N.Y. App. 2007) ............................................11, 12

*Summer Rain v. The Donning Co./Publishers Inc.*,
    964 F.2d 1455 (4th Cir. 1992) ...................................................................................36

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009) ................................................................................13

*Two Guys From Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*,
    472 N.E.2d 315 (N.Y. 1984) ....................................................................................20

*United States ex rel. MPA Constr. Inc. v. XL Specialty Ins. Co.*,
    349 F. Supp. 2d 934 (D. Md. 2004) .........................................................................37

*United States ex rel. Portland Constr. Co. v. Weiss Pollution Control Co.*,
    532 F.2d 1009 (5th Cir. 1976) .................................................................................37

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574, 80 S. Ct 1347 (1960).....................................................................24, 33

*Vigliarolo v. Sea Crest Constr. Corp.*,
    16 A.D.3d 409 (N.Y. App. Div. 2005) .....................................................................12

*Volvo Constr. Equip. of N. Am., Inc. v. CLM Equip. Co., Inc.*,
    386 F.3d 581 (4th Cir. 2004) .......................................................................14, 16, 17

## RULES AND STATUTES

9 U.S.C. § 2.............................................................................................................24

9 U.S.C. § 3.............................................................................................................37

28 U.S.C. § 2201(a) .................................................................................................14

FED. R. CIV. P. 12(b)(6) ....................................................................................5, 6, 8

Plaintiff MetroPCS Wireless, Inc. ("MetroPCS" or "Plaintiff") files this Memorandum in Opposition to Defendant TeleCommunication Systems, Inc.'s ("TCS" or "Defendant") Motion to Dismiss or, in the Alternative, to Compel Arbitration, or, in the Alternative, to Stay ("Motion").   In support of its Opposition, MetroPCS respectfully shows this Court the following:

## INTRODUCTION

TCS' motion to dismiss should be denied because this Court can and should rule that TCS has a duty to defend, indemnify, and hold harmless MetroPCS against the claims asserted against MetroPCS in the Patent Infringement Action.  Those claims fall squarely within the scope of the provision of the 11/12/07 Network Services Agreement imposing such duties on TCS, and New York law authorizes this Court to grant a traditional or conditional judgment enforcing those duties against TCS at this time and prior to the conclusion of the Patent Infringement Action.  Furthermore, this Court can and should deny TCS' motion to compel arbitration or to stay MetroPCS' claims in this lawsuit because TCS has failed to establish that there is an agreement compelling the arbitration of such claims.  TCS has failed to establish any legitimate justification for putting this case on hold pending the final disposition of the unrelated claims that are the subject of the separate and independent arbitration proceeding brought by MetroPCS.  Consequently, TCS' motions should be denied in full.

## STATEMENT OF FACTS

**I.     TCS Enters Into the 11/12/07 Network Services Agreement to Provide Location-Based Services to MetroPCS**

MetroPCS is a wireless provider.  Original Complaint, ¶ 9 (Exhibit 1).  As of December 31, 2008, MetroPCS has approximately 5.4 million customers in major metropolitan areas across the United States.  *Id*.  Among the many services MetroPCS offers to its network customers are applications commonly-referred to as "location-based services."  *Id*.  Because it does not currently have the

capability to provide location-based services itself, MetroPCS contracted with TCS for TCS to provide the products and services to allow MetroPCS to offer location-based services to its network customers. *Id*.; Decl. of Malcolm M. Lorang, ¶ 4 (Exhibit 2).

Location-based services are new and innovative information and entertainment services that allow mobile users to know their specific location;  the services provide personalized information and services tailored to the user's location.  Exhibit 1, ¶ 7.  Location-based services technology utilizes the geographic positioning of a mobile device to identify the location of the mobile user and, based on this information, provides access to a wealth of information regarding businesses, persons and objects in that area.  *Id*. ¶ 8. For example, with increasing popularity, mobile users are employing location-based services to locate food, lodging, and entertainment in the area, access information about current traffic conditions and alternate routing, and locate friends and family.  *Id*.

In order to provide these location-based services, several important pieces of network equipment are required.  Exhibit 2, ¶ 5.  Generally, a position determining engine ("PDE") is required, which takes certain information supplied by a user handset and uses that information to determine the handset's location.  *Id*.  The PDE uses certain information derived from the Global Positioning System ("GPS") operated by the United States Government.  *Id*.

As noted above, MetroPCS decided not to deploy its own PDE.  *Id*.  Rather, MetroPCS entered into the Network Services Agreement on November 12, 2007 with TCS ("Network Services Agreement").  Exhibit 1 at ¶ 10; 11/12/07 Network Services Agreement (Exhibit 3); Exhibit 2 ¶¶ 4-5.[1] Under the Network Services Agreement, TCS has been supplying MetroPCS the products and services

---

[1]     A copy of the 11/12/07 Network Services Agreement was attached as Exhibit A to MetroPCS' original complaint in this case.  Exhibit 1, Exh. A.

necessary for it to provide location-based services to its customers.  *See, e.g.*, Exhibit 1, ¶¶ 9-10; Exhibit 2, ¶ 4; Exhibit 3, ¶¶ 1.1, 2.1.

As part of the Network Services Agreement, TCS agreed to defend, indemnify, and hold harmless MetroPCS if MetroPCS, *inter alia*, were ever sued by a third-party for allegedly infringing the third-party's patent rights based on MetroPCS' use of products and services that TCS provided MetroPCS under that agreement.  Section 7.4 of the Network Services Agreement provides in relevant part:

> . . . ***TCS shall defend, indemnify and hold harmless [MetroPCS]*** and its officers and directors (each, an "Indemnified Party" and, collectively, the "Indemnified Parties") ***from and against any loss, damage, or liability, including reasonable costs and attorney fees, to the extent that such loss, damage or liability arises out of any third-party claim, suit, or allegation that [MetroPCS]'s use of any product or service provided by TCS under this Agreement*** or any claim under Section 7.2 or 7.3 ***infringes the patent***, trademark, copyright ***rights***, trade secret rights of other proprietary rights ***of such third party*** (collectively the "IP Claim"). . . .

Exhibit 3, ¶ 7.4 (emphasis added); *see also* Exhibit 1, ¶ 10.  This provision forms the basis of MetroPCS' claims against TCS in this lawsuit.

## II.    EMSAT Advanced Geo-Location Technology, LLC and Location Based Services LLC File Suit Against MetroPCS and Other Defendants in the United States District Court for the Eastern District of Texas, Alleging that MetroPCS' Provision of Location-Based Services to Its Customers Infringes the Patents-in-Suit

On or about October 7, 2008 – less than one year after MetroPCS entered into the Network Services Agreement with TCS – EMSAT Advanced Geo-Location Technology, LLC ("EMSAT") and Location Based Services LLC ("LBS") filed a patent infringement action in the United States District Court for the Eastern District of Texas (Marshall Division) against a number of defendants, including

MetroPCS Wireless, Inc. and MetroPCS Communications, Inc.[2] ("Patent Infringement Action"). Original Complaint in Patent Infringement Action (Exhibit 4).[3]

The complaint in the Patent Infringement Action plainly and unambiguously alleges that MetroPCS' use of location-based services – which, as shown above, could only be based on MetroPCS' use of the location-based services provided to it by TCS under the Network Services Agreement – infringes U.S. Patent Nos. 5,946,611 (filed June 21, 1996) ("the '611 Patent"), 6,847,822 (filed Sept. 15, 2000) ("the '822 Patent"), 7,289,763 (filed Nov. 21, 2004) ("the '763 Patent"), and the claimed invention described in U.S. Patent Application Pub. No. US 2008/0014965 A1 (filed Sept. 24, 2007) ("the '965 Publication") (collectively, the "Patents-in-Suit"). *See, e.g.*, Exhibit 4, pp. 4-8 (¶¶ 11-16, 18, 21, 24, 28) & Exhibit 4 Exhs. A, B & C.

III.   **Shortly After the Patent Infringement Action Is Filed, MetroPCS Asks TCS to Defend and Indemnify It Against the Patent Infringement Action in Accordance With Section 7.4 of the Network Services Agreement, But TCS Flatly Rejects MetroPCS' Request**

On October 21, 2008 – just two weeks after the Patent Infringement Action was filed – MetroPCS sent TCS written notice: (1) informing TCS of the Patent Infringement Action and of the plaintiffs' allegations that the location-based services provided to MetroPCS by TCS and used by MetroPCS infringed the Patents-in-Suit; and (2) requesting that TCS defend, indemnify, and hold harmless MetroPCS under Section 7.4 of the Network Services Agreement.   10/21/08 Ltr. From

---

[2]     MetroPCS Communications, Inc. is the parent corporation of MetroPCS, Inc., which in turn is the parent corporation of MetroPCS Wireless, Inc.  Decl. of J. Christopher Luna, ¶ 5 (Exhibit 7).  From the time this lawsuit was filed on to the present, MetroPCS Communications, Inc. has had direct or indirect ownership of 100% of the outstanding shares or equity of MetroPCS Wireless, Inc.  *Id.*

[3]     The original complaint in the Patent Infringement Action was attached as Exhibit B to MetroPCS' original complaint in this case.  Exhibit 1, Exh. B.

MetroPCS to TCS (Exhibit 5).[4]  In sending such notice, MetroPCS was complying with its obligation under Section 7.5 of the Network Services Agreement to provide TCS with "prompt written notice of any IP Claim or other claim under Sections 7.2 or 7.3 for which it seeks indemnification hereunder." Exhibit 3, ¶ 7.5.

On November 5, 2008, TCS responded to MetroPCS, acknowledging the plaintiffs' allegations in the Patent Infringement Action but disclaiming any obligation to defend, indemnify, and hold harmless MetroPCS in direct breach of TCS' obligations under Section 7.4 of the Network Services Agreement.  11/5/08 Ltr. From TCS to MetroPCS (Exhibit 6).[5]

IV.  **MetroPCS Files the Present Action Seeking Enforcement of TCS' Duty to Defend and Duty to Indemnify Under Section 7.4 of the Network Services Agreement**

Due to TCS' refusal to comply with its duties to defend, indemnify, and hold harmless MetroPCS and the immediate need for MetroPCS to begin its defense against the Patent Infringement Action, MetroPCS filed the present action against TCS seeking enforcement of those duties against TCS.  Exhibit 1.  Specifically, MetroPCS has pled the following causes of action based on TCS' refusal: (1) a declaratory judgment action requesting a declaration that TCS has an obligation to defend, indemnify, and hold harmless MetroPCS in the Patent Infringement Action; (2) a specific performance claim; (3) a breach of contract claim; (4) a common law indemnity claim; and (5) in the alternative, a common law contribution claim.  *Id.*  Rather than answering MetroPCS' complaint, TCS filed a putative motion to dismiss MetroPCS' claims in full under Federal Rule of Civil Procedure 12(b)(6) (and

---

[4]     The 10/21/08 letter from MetroPCS to TCS was attached as Exhibit C to MetroPCS' original complaint in this case.  Exhibit 1, Exh. C.

[5]     The 11/5/08 letter from TCS to MetroPCS was attached as Exhibit D to MetroPCS' original complaint in this case.  Exhibit 1, Exh. D.

alternative requests to arbitrate and for indefinite stay relief) to which MetroPCS now files this opposition.

## ARGUMENT

**I.     TCS' Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) Should Be Denied**

TCS' motion to dismiss the present action under Federal Rule of Civil Procedure 12(b)(6) on the ground that TCS does not have a duty to defend, indemnity, and hold harmless MetroPCS against the claims asserted against MetroPCS in the Patent Infringement Action should be denied because those claims fall squarely within the scope of Section 7.4 of the Network Services Agreement.  Under Section 7.4 of the Network Services Agreement, TCS is obligated to defend, indemnify, and hold harmless MetroPCS against the claims asserted in that action, and TCS' refusal to comply with such duties constitutes a clear breach of the Network Services Agreement.  Furthermore, MetroPCS' claims against TCS should not be dismissed as premature because they are ripe for determination by this Court either in a traditional judgment or a conditional judgment.

**A.     The Patent Infringement Action Falls Squarely Within the Scope of Section 7.4 of the Network Services Agreement**

The logical place to start in establishing that the claims asserted against MetroPCS in the Patent Infringement Action fall within the scope of Section 7.4 of the Network Services Agreement is the language of the provision itself.  The provision states, in full, as follows:

> 7.4     IP Claims.  Subject to [MetroPCS'] compliance with the terms of this Section 7.4 and Sections 7.5 and 7.6, **_TCS shall defend, indemnify and hold harmless [MetroPCS]_** and its officers and directors (each, an "Indemnified Party" and, collectively, the "Indemnified Parties") **_from and against any loss, damage, or liability, including reasonable costs and attorney fees, to the extent that such loss, damage or liability arises out of any third-party claim, suit, or allegation that [MetroPCS]'s use of any product or service provided by TCS under this Agreement_** or any claim under Section 7.2 or 7.3 **_infringes the patent_**, trademark, copyright **_rights_**, trade secret rights of other

> proprietary rights **of such third party** (collectively the "IP Claim").  TCS shall be entitled
> to solely control the defense of any such IP Claim with attorneys of its choice, and shall
> solely control the disposition of any such IP Claim provided such disposition admits no
> wrong-doing on the part of [MetroPCS].  [MetroPCS] shall not be entitled to any defense,
> indemnification or the like under this Section to the extent any such IP Claim arises out
> of [MetroPCS'] unauthorized use, negligent use, or misuse of any TCS product or
> service.

Exhibit 3, ¶ 7.4 (emphasis added / emphasis in original removed for clarity).[6]  In simple terms, the

provision expressly provides that: (1) TCS has both a duty to defend **and** a duty to indemnify and hold

harmless MetroPCS from any "loss, damage, or liability" in a patent infringement action; and (2) those

duties are triggered when a claim asserted against MetroPCS arises out of a "claim, suit, or allegation"

by a third-party that MetroPCS' "**use of any product or service provided by TCS under this Agreement**

. . . infringes the patent . . . rights . . . of such third party."  Exhibit 3, ¶ 7.4 (emphasis added).

Under Section 7.4, the first question is what "product or service" did TCS provide MetroPCS

under the Network Services Agreement?   There is no dispute that, under the Network Services

Agreement, TCS agreed to provide the necessary products and services for MetroPCS to offer "location-

based services" to its customers.  Exhibit 3; Exhibit 2, ¶¶ 4-5.  Location-based services are new and

innovative information and entertainment services that allow mobile users to know their specific

location;  the services provide users with personalized information and services tailored to their location.

Exhibit 1, ¶ 7.  Location-based services technology utilizes the geographic positioning of a mobile

device to identify the location of the mobile user and, based on this information, provides access to a

---

[6]  Section 7.5 of the Network Services Agreement requires that MetroPCS provide TCS "with prompt written
notice of any IP Claim . . . for which it seeks indemnification hereunder."  Exhibit 3, ¶ 7.5.  TCS does not – and
cannot – dispute in its motion to dismiss that MetroPCS promptly provided such written notice within two weeks
after the Patent Infringement Action was filed.  Exhibit 4, p. 9 (reflecting that Patent Infringement Action was
filed on October 7, 2008); Exhibit 5 (notifying TCS of Patent Infringement Action and requesting defense and
indemnity under Network Services Agreement); Exhibit 6 (acknowledging receipt of MetroPCS' 10/21/08 letter
"providing notice of the subject lawsuit and requesting indemnification under the referenced Contract").

wealth of information regarding businesses, persons and objects in that area. *Id*. For example, with increasing popularity, mobile users are employing location-based services to locate food, lodging, and entertainment in the area, access information about current traffic conditions and alternate routing, and locate friends and family. *Id*.

If not for products and services that TCS provided MetroPCS under the Network Services Agreement, there is no dispute that MetroPCS **would not** have been able to provide location-based services to its customers because there is no dispute that MetroPCS does not currently have the capability to provide such services itself. Exhibit 1, ¶ 9; Exhibit 2, ¶ 4. Stated another way, if MetroPCS had the capacity to provide location-based services on its own, then there would have been no need for it to enter into the Network Services Agreement with TCS.[7]

Having established that MetroPCS was using – and relied exclusively upon – the products and services provided by TCS under the Network Services Agreement to offer "location-based services" to MetroPCS' customers, the only remaining question is whether the claims asserted against MetroPCS in the Patent Infringement Action arise from MetroPCS' use of TCS' products and services provided under that agreement so as to trigger TCS' duty to defend, indemnify, and hold harmless MetroPCS under Section 7.4. The answer is unequivocally "yes".

This Court need look no further than the Plaintiff's Original Complaint as well as the Patents-in-Suit in the Patent Infringement Action to confirm this is true. There is no dispute that, under Section 7.4 of the Network Services Agreement, such action constitutes a "third-party claim, suit, or allegation" that MetroPCS infringed the patent rights of such third-party. Exhibit 3, ¶ 7.4. Specifically, the plaintiffs in

---

[7]  While the facts above are undisputed and in MetroPCS' favor, to the extent TCS disagrees and is able to present competent evidence to the contrary (which MetroPCS does not think TCS can), then that factual dispute warrants summary denial of TCS' motion to dismiss under Rule 12(b)(6) because this Court cannot resolve such factual disputes in a Rule 12(b)(6) motion.

the Patent Infringement Action allege that MetroPCS infringes the '611 Patent, the '822 Patent, and the

'763 Patent (collectively, "the Dennison Patents") and has provided notice of infringement of the '965

Publication.   Exhibit 4, pp. 4-8.   Critically, the plaintiffs expressly and unequivocally allege that

MetroPCS infringes the above patents by providing "**location-based services**."   For example:

- "15. . . . [C]ommentators have asserted that the FCC-required development of mobile E911 systems allowed the wireless carriers, such as Defendants, to develop and deploy commercial location-based services.   **These location-based services permit the cell phone user to use his or her cell phone as a navigation device, to locate nearby products and services, and to find friends, among other things.**   The Defendants often charge their customers a fee for providing such services.

  **Upon information and belief, Defendants, directly or through intermediaries, make, have made, use, sell, and/or offer for sale the above-described location-based services and systems for cellular telephones.   These services and systems infringe the Dennison patents.**"   Exhibit 4 at ¶¶ 15-16 (emphasis added).

- "Upon information and belief, Defendants have infringed and are continuing to infringe, contribute to the infringement of, and/or induce the infringement of, one or more of the claims of the '611 patent (namely, claims 1-5) without Plaintiffs' consent or authorization.   Such acts of infringement include Defendants' offer for sale, sale, use, and/or inducement of the use, offer for sale, and sale of mobile E911 services."   *Id.* at ¶ 18.

- "Upon information and belief, Defendants have infringed and are continuing to infringe, contribute to the infringement of, and/or induce the infringement of, one or more of the claims of the '822 patent (including, at least, claims 24 and 31) without Plaintiffs' consent or authorization.   **Such acts of infringement include** Defendants' offer for sale, sale, use, and/or inducement of the use, offer for sale, and sale of mobile E911 services and, **at least with respect to Defendants MetroPCS**, Centennial, and ETEX, **their offer for sale, sale, use, and/or inducement of the use, offer for sale, and sale of commercial location-based services**."   *Id.* at ¶ 21 (emphasis added).

- "Upon information and belief, Defendants have infringed and are continuing to infringe, contribute to the infringement of, and/or induce the infringement of, one or more of the claims of the '763 patent (including, at least, claims 1 and 23-32) without Plaintiffs' consent or authorization.   **Such acts of infringement include** Defendants' offer for sale, sale, use, and/or inducement of the use, offer for sale, and sale of mobile E911 services and, **at least with respect to Defendants**

> ***MetroPCS, Centennial, and ETEX, their offer for sale, sale, use, and/or
> inducement of the use, offer for sale, and sale of commercial location-based
> services***." *Id*. at ¶ 24 (emphasis added).

- "Upon information and belief, Defendants have infringed and continue to
  infringe, contribute to the infringement of, and/or induce the infringement of, one
  or more claims of the '965 Publication without Plaintiffs' consent or
  authorization. ***Such acts of infringement include*** Defendants' offer for sale, sale,
  use, and/or inducement of the use, offer for sale, and sale of mobile E911 services
  and, ***at least with respect to Defendants MetroPCS, Centennial, and ETEX,
  their offer for sale, sale, use, and/or inducement of the use, offer for sale, and
  sale of commercial location-based services***." *Id*. at ¶ 28 (emphasis added).

Exhibit 4 at 4-8; *see also id*. at Exhs. A, B & C.[8]

In light of (1) the plain and unambiguous language of the plaintiffs' complaint that MetroPCS is

being sued for providing location-based services and (2) TCS' agreement to provide location-based

services to MetroPCS under the Network Services Agreement, it defies explanation how TCS can

contend – much less assert ***as a matter of law*** – that the claims asserted against MetroPCS in the Patent

Infringement Action do not arise out of a third-party "claim, suit, or allegation" that MetroPCS' "use of

any product or service provided by TCS under this Agreement . . . infringes the patent . . . rights . . . of

such third party." Exhibit 3, ¶ 7.4. In its motion to dismiss, TCS' sole justification for ignoring its

duties to defend, indemnify, and hold harmless MetroPCS under Section 7.4 of the Network Services

Agreement is that the plaintiffs in the Patent Infringement Action were somehow required – but failed –

to expressly name TCS and allege that "'TCS'" products or services infringe the Patents-in-Suit in order

to trigger TCS' defense obligation. That is, the plaintiffs were actually required to expressly identify

---

[8]   MetroPCS disagrees that TCS products and services infringe the Patents-in-Suit, and nothing contained herein
shall be deemed an admission of such. However, regardless of whether TCS or MetroPCS in fact infringe the
Patents-in-Suit, the Network Services Agreement provides that TCS shall defend MetroPCS against claims or
allegations that TCS' products and services infringe a third-party's patents.

"TCS" by name in their complaint in that action.  Mot. to Dismiss, pp. 5-6.[9]  TCS' argument, of course, is patently meritless.  The plaintiffs' use of "magic words" cannot be a prerequisite to TCS' indemnity and defense obligations.

First, and most importantly, there is absolutely no contractual basis for TCS' argument.  TCS does not and cannot cite to any language in Section 7.4 of the Network Services Agreement stating that TCS' duty to defend and hold harmless is triggered *if and only if* a complaint expressly names "TCS" as the provider of the infringing products and services.  Exhibit 3, ¶ 7.4.  That reading is not supported by the text of Section 7.4.  All Section 7.4 requires is that the claims asserted against MetroPCS arise from the "use of any product or service provided by TCS under this Agreement."  *Id*.  If this Court were to adopt TCS' draconian "magic words" interpretation of the indemnity provision in this case – a familiar provision frequently found in agreements like this one – then the protection such provision offers would not be worth the paper on which it's printed.  Furthermore, had TCS wanted its defense obligations to be triggered only by being named as a provider, TCS could have drafted the Network Services Agreement to state as much.  TCS eschewed such an approach, choosing instead to use language that includes the obligation to defend when general allegations are made.

Second, TCS cites no case law where a court has adopted the novel interpretation of the indemnity provision that TCS espouses.  The two cases cited in TCS' Motion are inapposite.  Mot. to Dismiss, p. 6.  In *Sumba v. Clermont Park Associates, LLC*, 45 A.D.3d 671 (N.Y. App. Div. 2007), the sole issue was whether the indemnitee was entitled to indemnity from the indemnitor for a personal

---

[9]  As hard as it is to believe that this is TCS' position, that is what TCS' motion actually states.  Mot. to Dismiss, p. 5 ("By its plain terms, for the Texas Litigation to come within the scope of the indemnification provision, the Texas Plaintiffs must allege that MetroPCS' use of TCS' products or services infringes its patents.  The Texas Complaint, however, is devoid entirely of any mention of TCS or TCS' products or services.  Nowhere in the Texas Complaint do the Texas Plaintiffs allege that TCS, its products, or its services infringe its patents. . . .").

injury claim brought by an employee of a third-party contractor as opposed to a claim brought by the third-party contractor itself. *Id*. at 672-73. The case in no way purports to hold that the plaintiff suing the indemnitee must actually identify the indemnitor by name in order to contractually obligate the indemnitor to indemnify the indemnitee. TCS' reliance on *Vigliarolo v. Sea Crest Construction Corporation*, 16 A.D.3d 409 (N.Y. App. Div. 2005) is similarly misplaced. All that opinion states is that the indemnification provision at issue "did not specifically include the claims of [the third-party plaintiff's] employees." *Id*. at 410. Again, *Vigliarolo* in no way purports to hold that the plaintiff suing the indemnitee must actually identify the indemnitor by name in order to contractually obligate the indemnitor to indemnify the indemnitee.

Finally, TCS erroneously contends that if its products and services (as used by MetroPCS) infringed the Patents-in-Suit in the Patent Infringement Action, then the plaintiffs in that action "could, and undoubtedly would, have sued TCS directly." Mot. to Dismiss, p. 5 n. 5. According to TCS, the plaintiffs did not do so because its products and services do not infringe. *Id*. That is TCS' self-serving speculation for why it was not sued, but it's certainly not the only – much less the likeliest – explanation. Below are just a few of the potential alternative explanations for why the plaintiffs in the Patent Infringement Action have not sued TCS (yet):

- At the time they filed their Original Complaint (the live petition), the plaintiffs may not have known that TCS is the provider of the products and services that enable MetroPCS to provide location-based services to its customers.

- The plaintiffs perceive MetroPCS – a company with over 5 million customers – to have deeper pockets than TCS.

- The plaintiffs may believe that the damages against MetroPCS may be greater than against TCS.

- If the plaintiffs were to sue TCS, then any license agreement that the plaintiffs might reach with TCS in resolving the action (a frequent outcome in such actions)

12

would have the effect of licensing **all** of TCS' customers, thereby barring the plaintiffs from bringing further patent infringement actions against TCS' customers. *See, e.g.*, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 128 S. Ct. 2109 (2008); *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009). That is because licenses flow downstream from the licensor providing the allegedly infringing products and services (TCS) rather than upstream from the licensee that uses the allegedly infringing products and services (MetroPCS).

In sum, the fact that the plaintiffs in the Patent Infringement Action have yet to sue TCS hardly suggests – much less establishes as a matter of law – that the TCS products and services provided to MetroPCS under the Network Services Agreement are not the subject of that action.

The claims asserted against MetroPCS in the Patent Infringement Action fall squarely within the scope of Section 7.4 of the Network Service Agreement, and TCS has acted in bad faith in deliberately refusing to comply with its unambiguous and unequivocal duty to indemnify, defend, and hold harmless MetroPCS against the claims asserted in that action.

### B.    MetroPCS' Claims Are Not Premature

TCS further erroneously argues that MetroPCS' claims in this case should be dismissed without prejudice because they are premature. Mot. to Dismiss, pp. 6-7. As a threshold matter, it is important to emphasize that Section 7.4 of the Network Services Agreement imposes on TCS not just a duty to indemnify and hold harmless MetroPCS, but also a duty to defend MetroPCS in any covered third-party action such as the Patent Infringement Action. Exhibit 3, ¶ 7.4. Despite TCS' arguments to the contrary, different legal and factual considerations apply in determining whether MetroPCS' claims as to those two duties are mature. Consequently, if this Court ultimately concludes that MetroPCS' claim seeking enforcement of TCS' duty to indemnify and hold harmless is premature (which it is not), that **does not** mandate dismissal of MetroPCS' claim seeking enforcement of TCS' duty to defend.

1.    **MetroPCS' Declaratory Judgment Action Seeking Enforcement of TCS' Duty to Defend, Indemnify, and Hold Harmless Is Not Premature**

TCS' motion to dismiss MetroPCS' claims on the ground that they are premature fails as an initial matter because MetroPCS has pleaded, *inter alia*, a claim requesting a declaratory judgment that TCS has a duty to defend, indemnify, and hold harmless MetroPCS against the Patent Infringement Action.  Exhibit 1, ¶¶ 18-20.  A district court may grant a declaratory judgment if "the complaint alleges an 'actual controversy' between the parties 'of sufficient immediacy and reality to warrant issuance of a declaratory judgment.'"  *Volvo Constr. Equip. of N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004); 28 U.S.C. § 2201(a).  In this case, an "actual controversy" "of sufficient immediacy" between MetroPCS and TCS exists.  As shown above, the record conclusively establishes that a third-party patent infringement action is currently pending against  MetroPCS based on products and services provided by TCS under the Network Services Agreement.  There is a compelling need to determine right now whether TCS owes a duty to defend MetroPCS (*e.g.*, whether MetroPCS will have to select counsel, front the attorney's fees and costs of its defense, direct such defense, and to what degree TCS will be involved in MetroPCS' defense of that action) and whether TCS will be required to indemnify and hold harmless MetroPCS for any liability ultimately incurred in that action. Therefore, this Court can – and should – grant a declaratory judgment on these issues.

Both the United States Supreme Court and at least one New York appeals court have held that a declaratory judgment that a party has a duty to indemnify and/or duty to defend is proper even if the liability of the indemnitee in the underlying litigation has not yet been finally determined.  *See, e.g.*, *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 271-74, 61 S. Ct. 510 (1941); *Citywide Auto Leasing, Inc. v. City of New York*, 294 A.D.2d 528, 529 (N.Y. App. Div. 2002).

In *Maryland Casualty Company*, the plaintiff insurer issued a conventional liability policy to the defendant insured in which the insurer agreed not only to indemnify the insured for "any sums the latter might be required to pay to third parties for injuries to person and property caused by automobiles hired by the insured" but also to defend "any action covered by the policy which was brought against the insured to recover damages for such injuries."   312 U.S. at 271.   A two-vehicle accident subsequently occurred involving an employee of the insured, and the other party to the accident brought a state court action against the insured to recover damages that the other party allegedly sustained from the collision. *Id*.  The insurer then brought a separate action against the insured in federal court, seeking a declaratory judgment that the underlying state court action against the insured did not fall within the scope of the liability policy's indemnity provision;  thus, the insurer was not required to indemnify and defend the insured in the state court action.  *Id*.  On appeal, the Supreme Court held that "[i]t is clear that there is an actual controversy between the petitioner and the insured" as required to grant declaratory relief under the Declaratory Judgment Act despite the fact that the underlying state court action ***had not*** yet proceeded to judgment at the time the insurer brought its declaratory judgment action.  *Id*. at 271-74.

In *Citywide Auto Leasing, Inc.*, the plaintiffs brought a standalone declaratory judgment action against the defendants seeking to enforce the defendants' contractual duty to defend and indemnify the plaintiffs from "any and all actions that ***may*** be brought against them" arising out of an underlying automobile accident.   294 A.D.2d at 529 (emphasis added).   The New York Appellate Division concluded that the claims fell within the scope of the contractual indemnity provision and remanded the case "for the entry of a judgment declaring that the defendants are obligated to defend and indemnify the plaintiffs in any and all actions that ***may*** be brought against them" based on such accident.  *Id*. at 528–29 (emphasis added).  The highlighted language indicates that a declaratory judgment on the duty to defend

and duty to indemnify was mature even though no accident victim had yet filed suit against the indemnitee.

Thus, TCS' motion to dismiss MetroPCS' action in full as premature should be denied because – at a minimum – this Court can and should grant MetroPCS' request for a declaratory judgment that TCS owes a duty to defend, indemnify, and hold harmless MetroPCS in the Patent Infringement Action.[10]

> **2. Alternatively, This Court Can Enter a Conditional Judgment on MetroPCS' Claims Seeking Enforcement of TCS' Duty to Defend, Indemnify, and Hold Harmless**

Alternatively, this Court – at a minimum – can and should grant a conditional judgment that TCS has a duty to defend, indemnify, and hold harmless MetroPCS against the Patent Infringement Action under Section 7.4 of the Network Services Agreement.  In a footnote at the bottom of pages 6 and 7 of its motion to dismiss, TCS erroneously disregards ample New York precedent acknowledging a court's ability to grant a conditional judgment in indemnity cases like this one.  Mot. to Dismiss, pp. 6-7 n.6.  Specifically, TCS erroneously contends that a conditional judgment may be entered only when: (1) "indemnification is asserted in a third-party action";[11] or (2) the indemnitee "brings its claim 'on behalf

---

[10]  While a district court may exercise its discretion not to entertain a declaratory judgment action, such discretion is limited.  As the Fourth Circuit noted in *Volvo Construction*:

> The exercise of such discretion, however, is not without bounds.  We have held that a district court must have "good reason" for declining to exercise its declaratory judgment jurisdiction.  As Judge Parker aptly opined years ago, a district court is obliged to rule on the merits of a declaratory judgment action when declaratory relief "will serve a useful purpose in clarifying and settling the legal relations in issue," and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."

*Volvo Constr. Equip. of N. Am., Inc.*, 386 F.3d at 594 (citations omitted).  As noted above, the declaratory relief MetroPCS requests in this action would serve the useful purpose of clarifying and settling TCS' duty to defend, indemnify, and hold harmless MetroPCS in the Patent Infringement Action.

[11]  MetroPCS assumes TCS' reference to a "third-party action" to be a reference to an action in which an indemnitee brings the type of claims that MetroPCS is alleging against TCS as part of the main action containing the underlying claims from which the indemnitee seeks protection.  Under such an action, the indemnitee would be the "third-party plaintiff" and the indemnitor would be the "third-party defendant."

of' another party pursuant to a liquidation agreement containing an admission of the indemnitee's liability." *Id.* The circumstances in which a conditional judgment may be entered are not so limited.

First, while MetroPCS recognizes that conditional judgments on indemnity issues are generally entered in the context of a third-party action under New York law, TCS cites no legal authority or compelling policy justifications for expressly prohibiting such a conditional judgment from being entered in an independent action like this one. The same type of claim is being brought by and against the same type of parties seeking the same type of relief. Whether that claim is conditionally granted in a third-party action or in an independent action should not make any difference where the underlying rationale for allowing a conditional judgment is to help an indemnitee assess his potential for reimbursement as early in the litigation as possible.[12]

Indeed, while some New York courts have stated that "[a]s a general rule, a claim for indemnification does not accrue until payment has been made by the party seeking indemnification," others have held that "[d]eparture from this rule may be warranted where the interests of justice and judicial economy so dictate." *State of New York v. Syracuse Rigging Co.*, 249 A.D.2d 758, 759 (N.Y. App. Div. 1998). Significantly, the court in *Syracuse Rigging* made that statement in the context of an independent action brought by the indemnitee seeking indemnity. While the Appellate Division declined to depart from the general rule under the facts of that case, TCS fails to articulate any reasons why this Court should decline to grant a conditional judgment on MetroPCS' claims in this case – especially considering the compelling reasons why this Court should grant such a judgment.

---

[12] *See O'Brien v. Key Bank N.A.*, 223 A.D.2d 830, 831 (N.Y. App. Div. 1996) ("Initially, we reject [the indemnitor's] contention that [the] Supreme Court's determination was premature. It is well established that a court may render a conditional judgment on the issue of indemnity, pending determination of the primary action, in order that the indemnitee obtain the earliest possible determination as to the extent to which he or she may expect to be reimbursed").

Because MetroPCS has established as a matter of law in this brief that TCS owes a duty to defend, indemnify, and hold harmless MetroPCS against the Patent Infringement Action, it would not require this Court or the parties to expend significant additional time or resources to enter a conditional judgment enforcing those duties.  Indeed, the briefing on this issue is largely complete;  MetroPCS need only file its own motion for summary judgment incorporating the arguments it has set forth herein. Furthermore, as noted above, knowing whether a duty to indemnify and duty to defend exists may significantly impact MetroPCS' defense in the Patent Infringement Action.  For example, if this Court conditionally rules that TCS owes both a duty to indemnify/hold harmless and a duty to defend, that will likely result in TCS' decision to become directly involved in MetroPCS' defense of that action and to begin paying all attorney's fees and court costs – which are starting to mount.

New York courts have recognized that a court may enter a conditional judgment on an indemnity claim "where indemnification is based upon an express contract to indemnify against loss." *Martinez. v. Fiore*, 454 N.Y.S.2d 475, 475 (N.Y. App. Div. 1982).[13]  As shown above, MetroPCS' claims seeking enforcement of TCS' duty to indemnity and duty to defend are based on an express contract (Section 7.4 of the Network Services Agreement), and MetroPCS' right to indemnification and a defense under that contract is clear.

---

[13]  *See also Blair v. County of Albany*, 127 A.D.2d 950, 951 (N.Y. App. Div. 1987) ("[The indemnitor] asserts that summary judgment was prematurely granted in that [the indemnitee] has not yet incurred liability in the main action and that counsel fees were improperly awarded.  In light of the broad language used in the agreement in which [the indemnitor] assumed all responsibility for claims, it is not necessary for Westchester to have sustained actual damages in the main action in order to be entitled to enforce the agreement.  *We further conclude that [the] Supreme Court properly interpreted the provisions at issue as requiring [the indemnitor] to reimburse [the indemnitee] for its expenses already incurred and to assume its defense in the main action*") (emphasis added).

Therefore, this Court should reject TCS' contention that MetroPCS' claims should be dismissed without prejudice as premature and, instead, this Court should enter a conditional judgment in favor of MetroPCS on its claims upon MetroPCS' filing of a motion for summary judgment on those claims.

### 3. MetroPCS' Claims Seeking Enforcement of TCS' Duty to Defend Are Not Premature

Because New York law authorizes entry of a declaratory or conditional judgment enforcing TCS' duty to indemnify and hold harmless, this Court, at a minimum, also may grant a declaratory or conditional judgment enforcing TCS' duty to defend.  Indeed, as shown below, the arguments and authorities in support of this Court's ability to enter such a judgment are even stronger with respect to MetroPCS' claims seeking enforcement of TCS' duty to defend.   However, it is important to note that if this Court rules that MetroPCS' claim seeking enforcement of TCS' duty to *indemnify/hold harmless* is premature and should be dismissed, that *does not* mean that MetroPCS' claim seeking enforcement of TCS' duty to *defend* must be dismissed as well.  To the extent there is seemingly contrary authority on this issue (as suggested in TCS' Memorandum), such case law is readily distinguishable on the facts.

There is no dispute that, under black-letter New York law, the duty to defend is broader than the duty to indemnify when the party that allegedly owes those duties is an insurer.[14]  Thus, an insurer can be required to defend its insured in a lawsuit even absent a determination that the insurer owes a duty to indemnify the insured for any losses the latter may incur in the lawsuit.  850 N.E.2d at 1155.  Based on the plain and unambiguous language of Section 7.4 of the Network Services Agreement, the same rule

---

[14]  *See, e.g.*, *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006) ("It is well settled that an insurance company's duty to defend is broader than its duty to indemnify.  Indeed, the duty to defend is 'exceedingly broad' and an insurer will be called upon the provide a defense whenever the allegations of the complaint 'suggest . . . a reasonable possibility of coverage.'  'If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be.'" (citations omitted).

applies in this case because Section 7.4 makes clear that the parties intended for TCS' duty to defend to be broader than TCS' duty to indemnify:

> IP Claims.  Subject to [MetroPCS'] compliance with the terms of this Section 7.4 and Sections 7.5 and 7.6, ***TCS shall defend, indemnify and hold harmless [MetroPCS]*** . . . from and against any loss, damage, or liability, including reasonable costs and attorney fees, to the extent that such loss, damage or liability arises out of any third-party claim, suit, or allegation that [MetroPCS]' use of any product or service provided by TCS under this Agreement  . . . infringes the patent . . . rights . . . of such third party (collectively the "IP Claim"). ***TCS shall be entitled to solely control the defense of any such IP Claim . . . .*** provided such disposition admits no wrong-doing on the part of [MetroPCS].

Exhibit 3, ¶ 7.4 (emphasis added).  The first highlighted passage above clearly distinguishes TCS' duty to "defend" from its duty to "indemnify."  *Id*.  And the second highlighted passage above confirms that "defend" means something different from "indemnify."  *Id*.  Specifically, the second highlighted passage above: (1) confirms that "defend" means to provide TCS a defense in any covered action brought by a third-party against MetroPCS (in this case, the Patent Infringement Action); and (2) expressly and unequivocally reflects the parties' intent that TCS would be involved in the defense of any third-party action against MetroPCS ***while that action was being litigated***.  *Id*.

Significantly, the second highlighted passage would be mere surplusage if TCS' duty to defend arises only ***after*** liability is determined since counsel would have been long ago selected and the defense mounted so there would be little to control.  This is not what the parties could have intended, and TCS' unduly narrow interpretation of its duty to defend would render the last sentence of Section 7.4 meaningless in violation of black-letter New York contract law.  *See, e.g.*, *Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").

Furthermore, there is nothing in Section 7.4 of the Network Services Agreement that makes TCS' duty to defend contingent on a finding of liability against MetroPCS in the Patent Infringement

Action.  In fact, Section 7.4 plainly states that TCS' duty to defend MetroPCS is simply triggered by an ***allegation*** of infringement arising from MetroPCS' use of products or services provided under the Network Services Agreement.  Exhibit 3 ¶ 7.4.  ("***TCS shall defend*** . . . ***[MetroPCS]*** . . . from and against any loss, damage, or liability, ***including reasonable costs and attorney fees, to the extent that such loss damage or liability arises out of any third party*** claim, suit, or ***<u>allegation</u> that [MetroPCS]'s use of any product or service provided by TCS under this Agreement . . . infringes the patent . . . of such third party***") (emphasis added).  The plaintiffs in the Patent Infringement Action have clearly ***alleged*** that MetroPCS' use of TCS' location-based services infringes the Patents-in-Suit.

As a result, if this Court concludes that MetroPCS' claim seeking to enforce TCS' duty to indemnify and hold harmless is premature and should be dismissed without prejudice, then this Court ***should not*** dismiss without prejudice MetroPCS' claim seeking to enforce TCS' duty to defend because dismissal of the latter claim would effectively (and improperly) deprive MetroPCS of the defense it is expressly entitled to receive under Section 7.4 of the Network Services Agreement.

To the extent TCS is arguing that MetroPCS can simply sue to recover the attorney's fees and expenses it incurred in defending the Patent Infringement Action at the same time in the distant future when it sues to recover indemnification for any liability incurred in that action, that contention fails because it irreconcilably conflicts with the approach the parties adopted in Section 7.4 of the Network Services Agreement.  Again, the second highlighted passage above expressly states that "TCS shall be entitled to solely control the defense of any such IP claim."  *Id*.  TCS' right "to solely control the defense of any such IP claim" unambiguously reflects the parties' intent that TCS would be directly

participating in the defense of any third-party action against MetroPCS rather than sitting on the sidelines until the third-party action is over.[15]

In short, TCS' contention that Section 7.4 of the Network Services Agreement should be construed to make TCS' duty to defend coextensive with its duty to indemnify – *i.e.*, to exist if and only if TCS has a duty to indemnify – would render meaningless the two passages from Section 7.4 highlighted above. MetroPCS' common-sense construction of Section 7.4 is the only reasonable, plain reading construction. The Appellate Division's decision in *McCleary v. City of Glens Falls*, 32 A.D.3d 605 (N.Y. App. Div. 2006) supports MetroPCS' construction of Section 7.4 on this point.

In *McCleary*, the plaintiff filed a negligence action against the City of Glens Falls after his snowmobile struck a chain that had been placed across a roadway by the City. *Id.* at 606. The City then brought a third-party action against the County of Warren and a snowmobile club, seeking a defense and indemnification under a snowmobile trail license agreement that the City had with the County. *Id.* The County cross-claimed against the Club based on a snowmobile trail management agreement it had with the Club. *Id.* The trial court dismissed the plaintiff's complaint against the City, ruled that the County was required to defend the City, and ruled that the Club was required to defend the County. *Id.*

The Appellate Division affirmed the trial court's ruling that the Club was required to defend the County. *Id.* at 610. Significantly, the Court rejected the Club's contention that it was not required to defend the County because the County was not found liable. *Id.* at 609. Based on language similar to the language in Section 7.4 of the Network Services Agreement, the Appellate Division ruled that the

---

[15]  If this Court adopts TCS' position that MetroPCS cannot bring its claim seeking enforcement of TCS' duty to defend until after the Patent Infringement Action is over, then TCS – at a minimum – should be held to have waived and/or be estopped from later raising any defenses to its duty to defend and duty to indemnify that are based on how MetroPCS chose to defend itself in that action. TCS cannot have its cake and eat it too, by refusing to defend MetroPCS in that action only to complain after the fact about how the defense was conducted.

Club's duty to defend was an independent duty and *was not* predicated on a finding that the County was at fault:

> **Nothing in the broad language of the trail management agreement conditions the Club's duty to defend the County on a predicate finding of fault by the County.** Indeed, by agreeing to "defend, indemnify and hold harmless the County . . . from any and all claims, (including without limitation third party claims for personal injury and/or real or personal property damage), causes of action, losses, expenses . . . costs . . . interests or losses, including attorneys' fees . . . which the County . . . may suffer as a result of . . . the Club's activities," the Club expressly contemplated the absence of wrongdoing by the County. Thus, the fact that the County was not held liable did not vitiate the Club's duty to defend the County in connection with the third-party action. Inasmuch as the Club agreed to defend the County against any claims arising from the Club's "activities, conduct, omissions, non[]feasance or misfeasance" in developing and maintaining the trails under license from the City, the third-party complaint alleging that the County failed to properly monitor the trail system triggered the Club's duty to defend.

*Id*. at 609-10 (citations omitted) (emphasis added).

Thus, this Court – in accordance with the plain and unambiguous language of Section 7.4 of the Network Services Agreement and fundamental principles of New York contract law – should: (1) reject TCS' unreasonable construction of the provision and adopt MetroPCS'; and (2) deny TCS' motion to dismiss MetroPCS' claim seeking enforcement of TCS' duty to defend regardless of how this Court rules on MetroPCS' claim seeking enforcement of TCS' duty to indemnify/hold harmless.[16]

## II. TCS' "First Alternative" Arbitration Argument Is a Nonstarter

### A. The *Sine Qua Non* For Compelled Arbitration Is An Actual Agreement To Arbitrate The Dispute At Issue

At the threshold, TCS' arbitration arguments are fatally flawed and should be rejected because there has never been any agreement to arbitrate disputes relative to the year 2007 Network Services

---

[16] *See, e.g.*, *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 196 (N.Y. App. Div. 1995) ("It is a recognized 'rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect.' An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation") (quotation marks and citations omitted).

Agreement at issue in this lawsuit.  On the contrary, the parties expressly agreed that disputes would be litigated and decided in court.  It is a bedrock principle acknowledged in U.S. Supreme Court case law that – while courts are empowered to enforce agreements to arbitrate disputes – arbitration can never be ordered in the absence of such an agreement.  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S. Ct 1347, 1352–53 (1960) (holding that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit");  9 U.S.C. § 2.  TCS' cited opinions also emphasize the legal prerequisite that "a valid arbitration agreement exists and the issues in a case fall within its purview."  *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002);  *see, e.g. Am. Home Assurance Co. v. Vecco Concrete Constr. Co., Inc.,* 629 F.2d 961, 963 (4th Cir. 1980) ("Before the Federal Arbitration Act becomes applicable to the instant case, two findings must be made: (1) there was an agreement in writing providing for arbitration and (2) the contract evidences a transaction involving interstate commerce.") (citing *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 76 S. Ct. 273, 100 L. Ed. 199 (1956)).

> **B.     There Is No Arbitration Agreement Governing The 2007 Network Services Agreement – In Fact, The Parties Expressly Agreed That Disputes Would Be Resolved Through Litigation To Be Filed In New York City Or Maryland**

While Defendant TCS spills much ink in theorizing on the virtues of arbitration, TCS carefully avoids any meaningful discussion of the express dispute resolution provisions in the Network Services Agreement.  A plain reading of those negotiated contract terms establishes that:

(1)     the parties expressly reaffirmed their constitutional rights to access the courts to resolve their disputes;

(2)     arbitration was never agreed to and, in fact, was effectively rejected;

(3)     the parties did agree to a ***strictly optional and non–binding conciliation process***; and

(4)     the parties expressly agreed that *"the venue for any action brought hereunder shall be the federal or state courts located in New York, New York"* except in those instances where the parties unsuccessfully undertook "negotiation or use of the [non–binding conciliation] procedures" in which case "the Dispute *may be submitted to any federal or state court of competent jurisdiction sitting in and for the state of Maryland*."

(5)     A clear absence of an arbitration argument means that MetroPCS has not agreed to arbitrate its claims.

Exhibit 3 §§ 9.2 "Settlement of Disputes", 9.3 "Disputes", 9.10 "Governing Law and Language" and 9.11 "Entire Agreement".

### 1.     Section 9.10 – The Choice of Law and Litigation Forum Selection Clause

In their Network Services Agreement, the parties expressly agreed that New York substantive law would govern and that, subject to two other dispute resolution provisions in the Agreement, "the venue for any action brought hereunder shall be the federal or state courts located in New York, New York."  Exhibit 3 § 9.10 providing as follows:

**9.10 Governing Law and Language.**  This Agreement shall be construed and enforced in accordance with the Laws of the State of New York without regard to its conflicts of laws provisions.  Subject to Sections 9.2 and 9.3, the venue for any action brought hereunder shall be the federal or state courts located in New York, New York.  The English language shall govern this Agreement and all interpretations hereunder.

### 2.     Sections 9.2 and 9.3 – The Non–Binding Conciliation and Supplemental Litigation Forum Selection Clauses

Demonstrating their clear and careful consideration of ADR options, the parties included a specialized, non–binding conciliation option for senior executives to utilize in Section 9.2 of the Network Services Agreement.  Entitled "Settlement of Disputes", this section granted the parties the option to "elect to utilize a non–binding resolution procedure whereby each party presents its position at a hearing before a panel consisting of one senior executive of each of the parties and, if such senior executives can agree upon such an individual, a mutually acceptable neutral advisor."  Exhibit 3 § 9.2.

Section 9.3, entitled "Disputes," further provides, in its entirety, that "[i]f a claim, dispute or controversy (a "Dispute") arises out of or relates to this Agreement, or its breach, ***and the parties have not been successful in resolving such Dispute through negotiation or the use of the procedures described in Section 9.2, the Dispute may be submitted to any federal or state court of competent jurisdiction sitting in and for the state of Maryland.***" *Id.* § 9.3 (emphasis added).  In sum, Section 9.3 opens up the state and federal courts in Maryland as an additional agreed–to–litigation forum (in addition to New York City) if the parties have been unsuccessful in reaching a negotiated resolution of their disputes.

### 3.    Section 9.11 – The Integration Clause

Nowhere in the Network Services Agreement is there any mention or agreement as to arbitration in any form.  Nowhere in the document is there any incorporation of the separate year 2003 Emergency 9-1-1 Agreement.  And to make crystal clear that the 2007 Network Services Agreement was meant to stand on its own and "supersedes any and all prior agreements, related to the Services", the parties included an express integration clause as follows:

> **9.11 Entire Agreement.**  This Agreement, together with the attached Exhibits, which are incorporated herein by this reference, ***sets forth the entire agreement of the parties, and supersedes any and all prior agreements, related to the Services.  No change, amendment or modification of any provision of this Agreement will be valid unless set forth in a written instrument signed by both parties.***  [Exhibit 3 (emphasis added)]

The foregoing integration clause amply demonstrates the parties' intent that "any and all prior agreements, related to the Services" was being superseded.  Assuming, *arguendo*, the parties' separate 2003 Emergency 9-1-1 Agreement (coming four years ***before*** the 2007 Network Services Agreement) somehow "related" to the "Services" defined in the Network Services Agreement, Section 9.11 indisputably provides that the 2007 agreement "supersedes" the 2003 document.  That is, the parties'

express 2007 agreement to **litigate all disputes** arising out of or related to the Network Services Agreement must trump TCS' imagined argument that the parties somehow agreed (in the 2003 Emergency 9-1-1 Agreement) to arbitrate disputes relative to entirely separate contracts they might enter into, years in the future.  TCS has offered no evidence to support such an incredible scenario.  In any case, Section 9.11 provides that the Network Services Agreement "supersedes any and all prior agreements, related to the Services."

> C.    **The Separate 2003 And 2007 Agreements Relate To Entirely Different Services And The Texas Plaintiffs Assert That Different Patents Are Infringed By The Different Services — Importantly, The Arbitration Clause In The 2003 Emergency 9-1-1 Agreement States That It Is Limited "To This Agreement" Only**

The 2003 Emergency 9-1-1 Agreement covers only "TCS technical solutions to provide wireless enhanced 9-1-1 Services ('the TCS E9-1-1 Services')" which are precisely defined in the Agreement's Section 2 entitled "The Services" and in referenced exhibits.  TCS Memorandum Exhibit 3, Exh. A §§ 1.1, 2.1 ("TCS will use reasonable efforts to perform for CUSTOMER the TCS E9-1-1 Services, as set forth in Phase I and II Service Descriptions, [attached hereto as Exhibit B and the Hosted PDE Services Supplement and made a part of this Agreement,] for each public safety answering point ('PSAP'), requesting from the CUSTOMER such services on such activation date (the 'PSAP Activation Date').".

In their patent infringement suit, the plaintiffs have specifically identified the Emergency 9-1-1 services MetroPCS provides as violative of enumerated patents.  *See, e.g.* Exhibit 1, Exh. B ¶ 18 ([Count I] "Such acts of infringement [relative to patent '611] include Defendants' offer for sale, sale, use and/or inducement of the use, offer for sale, and sale of mobile E911 services.").  Importantly, the only allegation as to infringement of the '611 patent is through the provision Emergency 9-1-1 services.  *Id.* In light of the allegations of the suit, and the specific arbitration provision in the 2003 Emergency 9-1-1

Agreement, MetroPCS properly invoked arbitration of its Emergency 9-1-1 Agreement disputes with TCS *as such arise out of the 2003 Agreement*.  TCS Memorandum Exhibit 3, Exh. A § 9.3 ("If a claim, dispute or controversy (a 'Dispute') arises out of or relates to this Agreement, or its breach, and the parties have not been successful in resolving such . . . the Dispute will be decided by arbitration . . . .").

But the 2007 Network Services Agreement covers entirely distinct (non emergency 9-1-1) services that are described and defined with particularity.  Exhibit 3 § 2.1 ("TCS will provide the Hosted XLS Services described in the Services Description attached hereto as Exhibit A and Service Level Agreement attached hereto as Exhibit C.")  In counts II and III of their infringement suit, the plaintiffs assert that the "commercial location–based services" offered by MetroPCS violate the '822 and '763 patents.  Exhibit 1, Exh. B §§ 20–25.  Adhering to the mandatory litigation–forum selection terms in the 2007 Network Services Agreement (covering the provision of commercial location–based services), MetroPCS properly initiated the present lawsuit.  Exhibit 3 §§ 9.10, 9.3.

In sum, the 2003 and 2007 agreements cover distinct subject matters and the limited arbitration provision in the 2003 Emergency 9-1-1 Agreement covers only that specific document.  Because the infringement suit implicates different patents and services provided under the two different agreements, MetroPCS properly initiated arbitration of the separate Emergency 9-1-1 controversy with TCS and properly initiated this action relative to the 2007 Network Services Agreement (in the agreement–specified venue).

> **D.      Defendant TCS' "Significant Relationship" Cases Are Inapposite – None Deal With Successive Agreements, Four Years Separated, Covering Separate And Distinct Services With One Agreement Calling For Arbitration And The Latter One Disclaiming It**

Contrary to TCS' suggestion, neither the Fourth Circuit's decision in *American Recovery Corp. v. Computerized Thermal Imaging* nor *Long v. Silver* actually stands for TCS' sweeping proposition that

"[a] broadly worded arbitration clause in one contract may extend to a dispute arising under another contract when the dispute 'significantly relates' to the agreement containing the arbitration clause." TCS Memorandum p. 8.  Tellingly, TCS' carefully crafted – and self–serving – phraseology appears nowhere in these opinions.  The case law is far more constrained and exacting in its requirements than TCS admits in its Memorandum.

For example, the Fourth Circuit in *American Recovery Corp.* actually held that the parties' broadly worded "arbitration clause in the consulting agreement to arbitrate any dispute that 'arose out of or related to' the consulting agreement" would embrace not only claims involving "interpretation" of the agreement, but also specific claims for:

> (1)     tortious inducement to breach fiduciary duty (because "the proof of ARC's claim that CTI induced Secord to breach his fiduciary duty is rooted in the existence and terms of the consulting agreement"),
>
> (2)     tortious interference (because "ARC's claim of tortious interference with contractual relations clearly relates to the consulting agreement:  An express term of the consulting agreement mandates that CTI will not enter into any agreement with Fluor–Daniel in violation of the noncircumvention agreement.  Thus, the conduct of which ARC complains explicitly contravenes a term of the consulting agreement."); and
>
> (3)     quantum meruit (because "we likewise find that ARC's quantum meruit claim relates to the consulting agreement:  ARC again clearly relies on the terms of the consulting agreement to prove its claim.").

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93, 94, 95 (4th Cir. 1996) *(emphases omitted).*

In the present case, MetroPCS' entitlement to recovery under the parties' independent 11/12/07 Network Services Agreement is in no way "rooted in the terms and existence" of the separate 2003 Emergency 9-1-1 Agreement.  Those contracts – separated by nearly half a decade – are independent

29

legal instruments that create independent, stand–alone rights and obligations.  The *American Recovery* decision is, thus, inapposite.

Likewise, the Fourth Circuit's decision in *Long v. Silver* is also limited to its specific facts and nowhere announces the sweeping and unbounded proposition TCS advances.  *Long v. Silver,* 248 F.3d 309 (4th Cir. 2001).  Importantly, although the *Long* case did involve two highly interrelated contracts relative to shareholder and employment rights, ***both*** of those contracts included broadly–worded arbitration clauses.   248 F.3d at 313.   Further, the Fourth Circuit in *Long* described its holding in *American Recovery Corp.* in far narrower terms than those TCS advances — the *Long* court described *American Recovery* as holding that "***when proof of the claim is rooted in the terms and existence of the contract*, *the claim is arbitrable***."  *Id.* at 318.  (emphasis added).  True to this refined construction, the *Long* Court determined the plaintiff's claims to be subject to arbitration to the extent such claims "depend[] on the terms and existence of the 1972 and 1999 Agreements" ***both of which*** contained arbitration clauses.  *Id.* at 317–318.  In contrast, MetroPCS' entitlement to recover under the separate 11/12/07 Network Services Agreement exists wholly independent of the terms and existence of the 2003 agreement — that is, MetroPCS does ***not*** have to rely on the terms and existence of the separate 2003 agreement to recover for breach of the 2007 agreement.  *Long* is thus inapposite.

Likewise limited to its extraordinary facts is the decision in *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566 (4th Cir. 1998).  The arbitration agreement between the litigants in that case was contained in the last contract involving the parties and was profoundly broader than any at issue in *American Recovery* or *Long* — the *Cara's Notions* provision called for arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof, ***or any aspects of the relationship between Hallmark and Retailer***".  *Id.* at 569 (emphasis added).  Not surprisingly, the

Fourth Circuit ordered arbitration after noting that "[t]he instant conflict certainly relates to an aspect of the relationship between Hallmark and Cara's Notions" and "*[t]herefore [last–in–time] Contract II mandates arbitration of the dispute*."  *Id.* at 569 (emphasis added).  Of course, the last–in–time contract at issue between MetroPCS and TCS is the 2007 Network Services Agreement which disclaims and expressly supersedes any alleged agreement to arbitrate disputes relating to that instrument — the parties agreed to litigate in specifically designated fora.  Thus, the *Cara's Notions* case actually undercuts TCS' arguments.

Likewise, the Fourth Circuit's decision in *Long v. Silver* squarely undercuts TCS' arbitration arguments because it stands for the proposition that where parties enter into two contracts dealing with the same subject matter and the latter contract provides that it supersedes prior agreements, then the court is duty bound to apply the later–in–time contract.  248 F.3d at 313 ("The 1999 Agreement further provides that it 'supersedes any and all prior agreements' that pertain to its subject matter."); *id.* at 317 n. 5 ("We look to the provisions of the 1972 Agreement only to the extent the provisions of the 1972 Agreement do not conflict with those of the 1999 Agreement.  Where the provisions conflict, we rely upon the 1999 Agreement.").  As discussed *supra*, the 11/12/07 Network Services Agreement at issue in this case was executed nearly half a decade ***after*** the Emergency 9-1-1 Agreement and expressly: (1) requires litigation of disputes and (2) states that the Network Services Agreement "*sets forth the entire agreement of the parties, and supersedes any and all prior agreements, related to the Services.*" Exhibit 3 § 9.11 ("Entire Agreement") (emphasis added).  Under the Fourth Circuit's decision in *Long v. Silver*, even if the Court somehow concludes that the separate 2007 agreement is dependent on the "terms and existence of" the 2003 agreement, the Court is nonetheless duty bound to adhere to the litigation only directives in the superseding 11/12/07 Network Services Agreement.  As briefed above,

the undisputed documentary record establishes that the arbitration clause in the 2003 Emergency 9-1-1-Agreement applies "to this [2003] Agreement" only.  TCS' motion to compel arbitration should be denied.

> **E.      TCS' Speculative "Efficiency" and "Consistency" Arguments Are Wide Of The Mark And Cannot Substitute For The Requirement Of An Actual Agreement To Arbitrate Disputes Under The Network Services Agreement**

The question of whether an agreement to arbitrate even exists is a threshold matter for the court to decide.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S. Ct. 588 (2002) (noting that "a gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide").  The U.S. Supreme Court has recognized the aspiration to avoid duplicative litigation, but has underscored the court's paramount responsibility to enforce private agreements relative to arbitration (or nonarbitration) even if the result is piecemeal litigation.  *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238 (1985).  Courts should never "assume that the parties agreed to arbitrate unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920 (1995).  Any perceived efficiencies or desires to avoid potential inconsistencies cannot substitute for the requirement of an agreement to arbitrate and cannot change the rights of the parties.  *See, e.g. Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97, 53 S. Ct. 721 (1933) ("consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, *or change the rights of the parties,* or make those who are parties in one suit parties in another.") (emphasis added); *Local 1351 Int'l. Longshoremens Ass'n v. Sea–Land Serv. Inc.,* 214 F.3d 566, 570–71 (5th Cir. 2000) ("a district court may not order tripartite arbitration unless all three parties consent in writing to arbitration in the agreement itself, even if the result is piecemeal litigation").

Because arbitration is purely a matter of contract, "[t]he basic objective under the Arbitration Act is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, but to insure that commercial arbitration agreements, like other contracts, are enforced according to their terms and according to the intentions of the parties."  514 U.S. at 947 (citation omitted).  "Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: '[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 92 (4th Cir. 1996) (quoting *United Steelworkers,* 363 U.S. at 582).  In the limited arbitration clause of the 2003 Emergency 9-1-1 Agreement, the parties emphasized that arbitration applied "to this Agreement" only.  TCS Memorandum Exhibit 3, Exh. A § 9.3.

In sharp contrast, when MetroPCS and TCS entered into their 2007 Network Services Agreement, they specifically agreed and contracted that disputes thereunder would be resolved by litigation in the courts.  The record is undisputed that there is no agreement to arbitrate in the parties' Network Services agreement;  litigation is specified;  exclusive venues are enumerated.  Exhibit 3 §§ 9.10, 9.3.  The Court should deny TCS' motion to compel arbitration and should also deny TCS' related requests for relief — all of which depend on the pretended existence of a mythical agreement to arbitrate relative to the 11/12/07 Network Services Agreement.

### III.    TCS' Terse, "Second Alternative" Request For An Indefinite Stay Should Also Be Denied

#### A.    TCS' Case Authorities Demonstrate That Stay Relief Is *Not* Appropriate Here

TCS' own cited authorities emphasize that a stay is an "extraordinary remedy" and should only be granted after careful consideration of the factual record and application of the law;  judicial discretion is not unbounded.  *In re Mid–Atlantic Toyota Antitrust Litigation,* 92 F.R.D. 358, 360 (D. Md. 1981)

(cited and quoted at TCS' Memorandum p. 11).  Ironically, the *Mid–Atlantic* court actually ***denied the***

***requested stay relief*** the civil defendants had requested on the basis of anticipated parallel proceedings.

The court listed the following five factors in conducting its stay analysis and denying any stay:

> "(1)    the interest of the plaintiff in proceeding expeditiously with the civil action as balanced against the prejudice to the plaintiffs if delayed;
>
> (2)    the burden on the defendants;
>
> (3)    the convenience to the courts;
>
> (4)    the interest of persons not parties to the civil litigation; and
>
> (5)    the public interest."

*Id.* at 359 (citing *Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc., 87 F.R.D. 53 (E.D. Pa. 1980))*.

As in *Mid–Atlantic*, each of these factors weighs heavily against imposition of the blanket stay

TCS requests.  First, the prejudice to Plaintiff MetroPCS is "more than apparent" as "[w]itnesses

relocate, memories fade, and persons allegedly aggrieved are unable to seek vindication or redress for

indefinite periods of times on end."  *Id.* at 359.  Second, Defendant TCS is nowhere else defending a

case relative to breach of its obligations under the 11/12/07 Network Services Agreement.  Because TCS

is not facing parallel judicial proceedings turning on this same transaction and occurrence, "the

inappropriateness of a stay is manifest."  *Id.* at 360.  As detailed above, entirely distinct services are

covered in the separate 2003 and 2007 Agreements — and the plaintiffs allege that a different collection

of patents are infringed by each category of services.

Further, "[t]he third factor, convenience of the court, has been taken to refer to attempts of courts

to avoid wherever possible ***duplicative judicial effort***."  *Id.* (citing *Golden Quality supra*) (emphasis

added).  As with the defendants in *Mid–Atlantic,* TCS is ***not*** facing two proceedings in the court system

– only this one;  thus, "there are no duplicative judicial efforts to avoid."  *Id.*  Fourth, TCS has never

alleged, much less proved, that "the extraordinary remedy of a stay" is necessary for "protection of interests of persons who are not parties to the present civil litigation." *Id*. Relative to the fifth and final factor, just as in *Mid–Atlantic,* "[i]t is evident that the general public has a large stake in the outcome of this civil litigation, regardless of what that outcome might be" because, here, it impacts MetroPCS' provision of specialized cellular telephone services and features to millions of customers. Further, also as in *Mid–Atlantic*, the defendant has shown "no public interest in the grant of the stay." *Id*. Following TCS' cited *Mid–Atlantic* decision, this Court should deny TCS' requested stay relief. *Id*. at 359 ("No case cited to this Court has involved a blanket stay in such speculative circumstances.").

TCS' argument for a discretionary stay is also squarely undercut by its cited and quoted decision in *Climax Molybdenum Co. v. M/V Seatrain Antwerp*, 51 B.R. 192 (D. Md. 1984). There the court noted that in considering stay relief the court "must consider whether or not a discretionary stay is immoderate and therefore unlawful." *Id*. at 195 (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 257, 57 S. Ct. 163, 81 L. Ed. 153 (1936)). The court held that "[w]hether such a stay is immoderate 'is a function of two variables — the scope of the stay and the reasons cited for ordering it.'" *Id*. at 196 (citing *Hines v. D'Artois*, 531 F.2d 726, 733 (5th Cir. 1976)).

While the court had initially granted a discretionary stay in *Climax Molybdenum*, it ultimately reversed itself and ordered the stay lifted as "immoderate" noting that there was "no indication that the [related] bankruptcy proceedings will be completed in the near future" and noting that if, as predicted, the bankrupt will ultimately not be liable for the claims asserted, "then there exists no good reason to continue the stay." *Id*. In the present case, TCS has presented no evidence that the separate arbitration on the 2003 Agreement "will be completed in the near future." Further, TCS asserts that, as a matter of law, it is not liable on the lawsuit asserted against it under the 2007 Network Services Agreement; thus,

35

following the holding and reasoning in *Climax Molybdenum,* "there exists no good reason" for a stay in this case. *Id.*

Defendant TCS also misplaces its reliance on *Summer Rain v. The Donning Co./Publishers Inc.*, 964 F.2d 1455 (4th Cir. 1992). In that case, the Fourth Circuit reaffirmed that stay relief is only potentially appropriate as to "non–arbitrable issues **which depend on arbitrable issues.**" *Id.* at 1461 (emphasis added). In *Summer Rain,* authors sued over alleged violation of their publishing contracts; each of which contained an arbitration provision. *Id.* The Fourth Circuit determined that "since ascertainment of monies due the authors is subject to the resolution of arbitrable claims, such ascertainment, with the exception of [non–arbitrable] count 4, must await the result of the arbitration. Even if whether *any* royalty must be due is arbitrable, ascertainment of the amount due in each case is not arbitrable." *Id.* at 1461–62. Contrary to TCS' suggestion, the Fourth Circuit in *Summer Rain* did ***not stay*** the litigation on the non–arbitrable issue — in fact, the Fourth Circuit held that "litigation may proceed on that count without regard to the arbitration, if the district court in its discretion thinks that is appropriate." *Id.* at 1461. In fact, the Fourth Circuit affirmed the district court's refusal to stay litigation on the non–arbitrable claim. *Id.* at 1462. In the present case, no aspect of MetroPCS' lawsuit on the 2007 Network Services Agreement "depends on" the outcome in the arbitration on the separate 2003 Emergency 9-1-1 Agreement; MetroPCS' claims in the present case are legally independent and raise no issues referable to arbitration; different services are involved and the plaintiffs allege that these different services infringe on a different collection of patents; the parties expressly agreed to litigate disputes relative to the Network Services Agreement. Exhibit 3 §§ 9.10, 9.3**.** Accordingly, stay relief is wholly inappropriate.

TCS' other cited authorities relative to stay relief are inapposite construction cases where liability among and between contractors, owners, subcontractors and indemnitors is inextricably intertwined with, and dependent upon, issues irrefutably referable to arbitration.  *See, e.g. Am. Home Assurance Co. v. Vecco Concrete Constr. Co., Inc.,* 629 F.2d 961 (4th Cir. 1980);  *United States ex rel. MPA Constr. Inc. v. XL Specialty Ins. Co.*, 349 F. Supp. 2d 934, 940 (D. Md. 2004) ("when a general contractor requests a stay of a Miller Act action by a subcontractor against both the general contractor and the surety, 'there can be no question that, under language of [9 U.S.C. §3], defendants were entitled to the stay asked.'") (citing *Agostini Bros. Bldg. Corp. v. United States*, 142 F.2d 854, 855 (4th Cir. 1994)) and adding "where subcontractor arbitrates against general contractor and litigates separately against surety pursuant to the Miller Act, 'the Federal Arbitration Act specifically provides for a stay'") (citing *United States ex rel. Portland Constr. Co. v. Weiss Pollution Control Co.*, 532 F.2d 1009, 1013 (5th Cir. 1976));  *Inst. of Mission Helpers of Baltimore City v. Reliance Ins. Co.*, 812 F. Supp. 72, 76 (D. Md. 1992) (granting stay in construction dispute after noting that "[a]rbitration proceedings *in this matter* commenced on November 6, 1991, when Kasco filed a demand for arbitration with the American Arbitration Association.") (emphasis added).

Of course, the present dispute does not involve a construction contract containing an arbitration clause.  Instead, the present case turns a stand–alone, inch–thick contract between sophisticated parties who expressly agreed that disputes relative to that contract would have to be litigated.  The parties' agreement *not to arbitrate* relative to the Network Services Agreement should be enforced.  Exhibit 3 §§ 9.10 and 9.3.

**B.** **The Separate Arbitration On The 2003 Emergency 9-1-1 Agreement Cannot Lawfully Impede This Court's Determination Of The Issues Relative To The Separate 2007 Network Services Agreement**

The central theme of TCS' stay argument is that this Court should stop all its processes and wait for conclusion of the separate arbitration proceedings because, TCS suggests, the arbitrator's determinations there could impact the present litigation.  As briefed *supra*, that is simply not the case.  The 2003 Emergency 9-1-1 Agreement and the 2007 Network Services Agreement are separate and independent agreements that create independent rights and obligations; the documents cover district services and different patents.  And, in any case, the arbitration proceedings and the outcome in those proceedings will be held in secrecy — the parties' 2003 Emergency 9-1-1 Agreement requires complete confidentiality.  Section 9.3 "Arbitration" in the 2003 Agreement expressly provides that, "[t]he parties, their representatives, other participants and the arbitrator *shall hold the existence, content and result of the arbitration in confidence*." TCS Memorandum Attachment 3, Exhibit "A" (emphasis added).  As a practical matter, this strict confidentiality provision in the 2003 Emergency 9-1-1 Agreement precludes the republishing of the arbitration proceedings for purposes of the separate litigation now pending in this Court relative to the 2007 Network Services Agreement.  There simply exists no lawful or prudential obstacle to prompt resolution of the pending litigation.  TCS' Motion should be denied.

## OBJECTIONS, RESERVATIONS AND PRAYER

MetroPCS objects to the entirety of the "Statement of Facts" set out in TCS' Motion on the grounds that, *inter alia*, the Statement is argumentative, incomplete and misleading.  MetroPCS provides its own Statement of Facts set forth *supra.*

MetroPCS also objects to the entirety of the Motion insofar as it constitutes an improper attempt to obtain dispositive–motion type relief under the guise of a motion to dismiss.  As the Court's file

reflects, Defendant TCS has filed and relied upon extraneous materials and evidence in support of its Motion and has judicially admitted that it is seeking substantive, merits determinations through its so–called Motion to Dismiss — "TCS maintains that its duty pursuant to the indemnification provisions of the Agreements properly may be determined in a motion to dismiss".  TCS Memorandum p. 13.  The Court should treat TCS' Motion as an improper dispositive motion, deny TCS' requested dismissal, arbitration, and stay relief, require TCS to answer the underlying lawsuit and to refile any dispositive motion in due course.

MetroPCS respectfully reserves all positions, rights, remedies and challenges.  MetroPCS expressly objects to, *inter alia*, entry of any order dismissing this case, compelling arbitration, consolidating this case with the separate 2003 Emergency 9-1-1 Agreement arbitration, or staying this litigation.

WHEREFORE, for the reasons set forth above, MetroPCS respectfully requests that TCS' Motion and Memorandum in Support of "Defendant's Motion to Dismiss or, in the Alternative, to Compel Arbitration, or, in the Alternative, to Stay" be in all things denied.

Respectfully submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

**By**    /s/ *Matthew H. Kirkland*          

Matthew H. Kirtland
      Md. State Bar No. 26089
801 Pennsylvania Avenue, N.W.
Washington, DC 20004-2623
Telephone:  202.662.0200
Facsimile:  202.662.4643
E–mail:  mkirtland@fulbright.com

Brett C. Govett (admitted *pro hac vice*)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:  214.855.8000
Facsimile:  214.855.8200
E–mail:  bgovett@fulbright.com

ATTORNEYS FOR PLAINTIFF,
METROPCS WIRELESS, INC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of June, 2009, a copy of the foregoing instrument was served on all parties by electronic filing with the Clerk of the United States District Court for the District of Maryland.

/s/ *Matthew H. Kirkland*

Mathew H. Kirkland

**PLAINTIFF METROPCS WIRELESS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, TO STAY**

| Exhibit Tab | Description |
| --- | --- |
| 1 | Original Complaint in C.A. No. 1:09-CV-00601-WDQ; *MetroPCS Wireless, Inc. v. Telecommunication Systems, Inc.*; In the United States District Court for the District of Maryland (Northern Division) |
| 2 | Declaration of Malcolm M. Lorang |
| 3 | Network Services Agreement dated November 12, 2007 between MetroPCS and TCS |
| 4 | Original Complaint dated October 7, 2008 filed in Civil Action No. 2:08-CV-381; EMSAT Advanced Geo-Location Technology, LLC and Location Based Services LLC v. MetroPCS Communications, Inc., MetroPCS Wireless, Inc., et al.; In the United States District Court for the Eastern District of Texas as well as Exhibit A (U.S. Patent No. 5,946,611), Exhibit B (U.S. Patent No. 6,847,822), and Exhibit C (U.S. Patent No. 7,289,763) to that pleading |
| 5 | October 21, 2008 letter from J. Christopher Luna to TCS |
| 6 | TCS' 11/5/08 letter to J. Christopher Luna |
| 7 | Declaration of J. Christopher Luna |