**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **METROPCS WIRELESS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:09–CV–00601–WDQ** |
| | ) | |
| **TELECOMMUNICATION SYSTEMS,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# EXHIBIT C [Part 1 of 4]

PLAINTIFF METROPCS WIRELESS, INC.'S MOTION TO TAKE JUDICIAL NOTICE OF DEFENDANT TCS'
CONTRADICTORY LITIGATION AND ARBITRATION FILINGS

## AMERICAN ARBITRATION ASSOCIATION

METROPCS COMMUNICATIONS, )
INC. and METROPCS WIRELESS, INC., )
                                   )
    **Claimants,**              )
                                   )
v.                               )     **CASE NO.** _____
                                   )
TELECOMMUNICATION SYSTEMS, )
INC., )
                                   )
    **Respondent.**

AMERICAN ARBITRATION
ASSOCIATION
RECEIVED

**MAR 1 0 2009**

**CCMC**

### CLAIMANTS' DEMAND FOR ARBITRATION

Claimants MetroPCS Communications, Inc. ("*Communications*") and MetroPCS Wireless, Inc. ("*Wireless*") (collectively, "*MetroPCS*" or "*Claimants*") file this their Demand for Arbitration against Respondent TeleCommunication Systems, Inc. ("*TCS*" or "*Respondent*") and, in support thereof, respectfully state as follows:

### I.
### PARTIES

1.    Communications is a Delaware corporation with its principal place of business at 2250 Lakeside Boulevard, Richardson, Texas 75082.

2.    Wireless is a Delaware corporation with its principal place of business at 2250 Lakeside Boulevard, Richardson, Texas 75082.

3.    TCS is a Maryland corporation with its principal place of business at 275 West Street, Suite 400, Annapolis, Maryland 21401. TCS may be served with process by serving its registered agent, CSC – Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 1660, Baltimore, Maryland 21202.

## II.
### JURISDICTION AND VENUE

4.      Respondent has demanded arbitration and pursuant to Section 9.3 (Arbitration) of

the E9-1-1 Network Services Agreement, dated April 11, 2003, between TCS and MetroPCS

Wireless, its Affiliates[1] and Designated Entities (as such term is defined in the E9-1-1

Agreement), as amended (hereinafter referred to as "*E9-1-1 Agreement*"),[2] the American

Arbitration Association ("*AAA*") has jurisdiction over this dispute.  Section 9.3 (Arbitration) of

the E9-1-1 Agreement contains the following arbitration clause:

> If a claim, dispute or controversy (a "Dispute") arises out of or
> relates to this Agreement, or its breach, and the parties have not
> been successful in resolving such Dispute through negotiation or
> the use of the procedures described in Section 9.2, the Dispute will
> be decided by arbitration administered by the American Arbitration
> Association ("AAA") in accordance with its Commercial
> Arbitration Rules. . . .[3]

This dispute arises out of TCS' failure to defend, indemnify and hold harmless MetroPCS as

required by Section 7.4 (IP Claims) of the E9-1-1 Agreement.  The parties were not successful in

resolving this dispute through discussions and negotiation and TCS has failed to timely elect to

use the procedure described in Section 9.2 (Settlement of Disputes).[4]  Therefore, this dispute is

properly before the AAA.

---

[1] Under Amendment No. 1 to the E9-1-1 Agreement, "'Affiliates' is defined as any entity that directly or indirectly, owns, is owned with, or is owned by MetroPCS Wireless, Inc." Communications is the ultimate parent corporation and *owner* of Wireless and, therefore, is covered by the indemnity provisions of the E9-1-1 Agreement at issue in this Complaint.

[2] *Id.*, Section 9.3 (Arbitration) at p. 6.

[3] *Id.*, Section 9.3 (Arbitration) at p. 6.

[4] *Id.*, Section 9.2 (Settlement of Disputes) at p.6.  Section 9.2 requires a party to the E9-1-1 Agreement to elect settlement of a dispute under the procedure set forth therein "within five (5) business days after receipt of a notice from the other party of a dispute arising out of or related to th[e] [E9-1-1 Agreement]."  MetroPCS sent notice of this dispute by letter dated October 21, 2008, executives of TCS and MetroPCS discussed MetroPCS' request for indemnity, and TCS acknowledged previous receipt of this letter and provided a written response on November 5, 2008; but TCS failed to timely elect the settlement procedures set forth in Section 9.2.

75625504.5/10900293

5.     Section 9.3 (Arbitration) further provides that ". . . the United States Federal Arbitration Act shall govern the interpretation and enforcement of this arbitration provision," and requires that the "arbitration be held (a) in Annapolis, Maryland."[5]

## III.
### SUMMARY OF DISPUTE

6.     MetroPCS' claims arise out of TCS' failure to defend, indemnify and hold harmless MetroPCS from claims made and alleged in Civil Action No. 2:08cv381, styled *EMSAT Advanced Geo-Location Technology, LLC et al. v. MetroPCS Communications, Inc. and MetroPCS Wireless, Inc. et al.*, which is currently pending in the United States District Court for the Eastern District of Texas—Marshall Division (the "*Federal Court Action*").[6] MetroPCS contracted with TCS for TCS to provide E9-1-1 Services, which include the use and deployment of TCS' wireless enhanced 9-1-1 technology and services.  Under the parties' agreement, MetroPCS assumed no liability for intellectual property claims ("*IP Claims*") resulting from its use or sale of TCS' wireless enhanced 9-1-1 technology, and TCS agreed to defend, indemnify and hold harmless MetroPCS from any third-party IP Claims against MetroPCS arising from its use or sale of this technology and services.  *See* Section 7.4 (IP Claims) of the E9-1-1 Agreement.

7.     MetroPCS was sued in the Federal Court Action by EMSAT Advanced Geo-Location Technology, LLC ("*EMSAT*") and Location Based Services, LLC ("*LBS*") (collectively, the "*Federal Plaintiffs*") on October 7, 2008.  Federal Plaintiffs' core allegation in the Federal Court Action is that MetroPCS infringes Federal Plaintiffs' patents through MetroPCS' use and sale of wireless enhanced 9-1-1 technology and services provided by TCS - -

---

[5] *Id.*, Section 9.3 (Arbitration) at p. 6.
[6] A true and correct copy of the complaint filed in the Federal Court Action ("*Complaint*") is attached hereto as Exhibit B.

the exact technology and services that MetroPCS contracted with TCS to use and sell under the E9-1-1 Agreement, and the exact IP Claims for which TCS agreed to defend, indemnify and hold harmless MetroPCS. Upon receipt, MetroPCS promptly notified TCS of the Federal Court Action and the allegations contained therein and demanded that pursuant to Section 7.4 (IP Claims) of the E9-1-1 Agreement TCS defend, indemnify and hold harmless MetroPCS from the Federal Court Action. TCS has refused to fulfill its obligations under the E9-1-1 Agreement. MetroPCS now files this arbitration seeking a declaratory judgment that TCS under the E9-1-1 Agreement has an obligation to defend, indemnify and hold harmless MetroPCS against the Federal Court Action, specific performance by TCS of these obligations, damages for TCS' breach of the E9-1-1 Agreement, and payment of any royalties or damages arising out of the Federal Court Action.

## IV.
### STATEMENT OF FACTS

### A.   *Enhanced 9-1-1 Program*

8.   In 1996, the Federal Communications Commission ("*FCC*") established the Enhanced 9-1-1 program ("*E9-1-1 Program*"). The E9-1-1 Program is designed to extend the existing E9-1-1 system to wireless communications and to provide location information about callers to further public safety. Carriers may use either a network based solution or handset based solution to meet the FCC requirements. The Enhanced 9-1-1 Program used by MetroPCS and purchased from TCS is a handset based solution that uses the Global Positioning System ("*GPS*") along with technology and services provided by TCS to automatically determine a physical geographic location with a calling party's telephone number, associate the geographic location with an address, and provide the address information and other information to the appropriate Public Safety Answering Point ("*PSAP*"). This program is designed to provide

4

emergency responders with critical location information without the difficulty and delay associated with the caller having to provide such information in an emergency situation.

9.    The FCC has implemented the Enhanced 9-1-1 Program in two phases with varying specifications regarding the precision with which caller location information must be provided. Under "Phase II" of the E9-1-1 Program, all wireless providers in the United States are required to meet FCC accuracy standards by providing caller location information with increased precision over the standards previously set by "Phase I".

**B.    *The Relationship Between MetroPCS and TCS***

10.    MetroPCS is a wireless provider. As of December 31, 2008, MetroPCS has approximately 5.4 million customers in major metropolitan areas across the United States. Thus, MetroPCS is subject to FCC regulations and is required to comply with the FCC's E9-1-1 Program. MetroPCS in complying with its obligations under the FCC's E911 rules decided to contract with TCS to provide the necessary services and technology, including TCS' wireless enhanced 9-1-1 technology, to ensure compliance with the FCC's Phase II specifications for its E9-1-1 program.

11.    On information and belief, TCS provides wireless solutions to government customers, public safety and wireless providers. Among the many products and services TCS provides are wireless enhanced 9-1-1 services and technology which comport with the precision requirements mandated by Phase II of the E9-1-1 Program.

12.    On April 11, 2003, MetroPCS and TCS entered into the E9-1-1 Agreement, as amended by Amendment No.1 effective April 11, 2003, Amendment No. 2 effective April 1, 2007, and Amendment No. 3 effective January 1, 2008. Section 1 (Relationship of the Parties) of the E9-1-1 Agreement defines the relationship between MetroPCS and TCS. Section 1.1 (Appointment) states: "[MetroPCS] will make use of and deploy TCS technical solutions to

5

provide wireless enhanced 9-1-1 services ("the TCS E9-1-1 Services") throughout its present

markets."[7]   Section 7.4 (IP Claims) of the E9-1-1 Agreement provides that TCS will:

> **IP Claims.** Subject to [MetroPCS'] compliance with the terms of
> this Section 7.4 and Sections 7.5 and 7.6, TCS **shall defend,
> indemnify and hold harmless** [MetroPCS] and its officers and
> directors (each, an **"Indemnified Party"** and, collectively, the
> **"Indemnified Parties"**) from and against any loss, damage, or
> liability, including reasonable costs and attorney fees, **to the extent
> that such loss, damage or liability arises out of any third-party
> claim, suit, or allegation that [MetroPCS'] use or sale of any
> Product or Services pursuant to the terms of this condition
> infringes the patent,** trademark, copyright rights, trade secret
> rights of [sic] other proprietary rights of such third party
> (collectively the **"IP Claim"**). . . . (Emphasis added)[8]

MetroPCS uses TCS' technology and services to provide wireless enhanced 9-1-1 services in

compliance with Phase II specifications of the Enhanced 9-1-1 Program.

## C.   The Federal Court Action

13.     On October 7, 2008, Federal Plaintiffs filed the Federal Court Action against

MetroPCS.  In the Federal Court Action, Federal Plaintiffs allege that EMSAT is the assignee

and owner of all rights, title and interest in, and LBS is the exclusive licensee of the following

patents: U.S. Patent No. 5,946,611 ("*'611 Patent*") issued for "Cellular Telephone System That

Uses Position of a Mobile Unit to Make Call Management Decisions"; U.S. Patent No.

6,847,822 ("*'822 Patent*") issued for "Cellular Telephone System That Uses Position of a Mobile

Unit to Make Call Management Decisions"; U.S. Patent No. 7,289,763 ("*'763 Patent*") issued

for "Cellular Telephone System That Uses Position of a Mobile Unit to Make Call Management

Decisions"; and U.S. Patent Application Pub. No. US 2008/0014965 A1 ("the '965 Publication")

---

[7] E9-1-1 Agreement, Section 1.1 (Appointment) at p. 1.
[8] *Id.*, Section 7.4 (IP Claims) at p. 5.

entitled "Cellular Telephone System That Uses Position of a Mobile Unit to Make Call Management Decisions" (collectively the "*Patents*").[9]

14.     Federal Plaintiffs' core allegation in the Federal Court Action is that MetroPCS' "offer for sale, sale, use, and/or inducement of the use, offer for sale, and sale" of mobile E911 services and commercial location based services infringes Federal Plaintiffs' patent rights.[10] More simply stated, Federal Plaintiffs' Federal Court Action is a third-party suit alleging that MetroPCS' use or sale of the wireless enhanced 9-1-1 service and technology provided to MetroPCS by TCS under the E9-1-1 Agreement infringes the Patents. Although MetroPCS denies that it infringes Federal Plaintiffs' Patents, nonetheless MetroPCS is required to defend against the Federal Court Action and TCS is obligated to defend, indemnify and hold MetroPCS harmless from and against the Federal Court Action.

**D.     *TCS' Duty to Defend, Indemnify and Hold Harmless MetroPCS Under the E9-1-1 Agreement***

15.     Fundamental to the E9-1-1 Agreement is MetroPCS' use and sale of TCS' wireless enhanced 9-1-1 service and technology. Without the TCS E9-1-1 technology and service, MetroPCS would need to contract with a third party for such technology and service or implement its own network. Since TCS provides the enhanced 9-1-1 services and technology to MetroPCS, MetroPCS relies on TCS to ensure that TCS' service and technology is free from IP Claims, and that MetroPCS' use and sale of such technology comports with federal, state and local laws. MetroPCS expressly disclaimed any assumption of such liability for IP Claims in entering into the E9-1-1 Agreement and bargained for an indemnity, defense and hold harmless agreement from TCS related to TCS' E9-1-1 services and equipment. Section 7.4 (IP Claims) of the E9-1-1 Agreement provides as follows:

---

[9] Complaint at pp. 4, 7-8.
[10] *Id.* at pp. 6-8.

75625504.5/10900293

> **IP Claims.** Subject to [MetroPCS'] compliance with the terms of
> this Section 7.4 and Sections 7.5 and 7.6, TCS *shall defend,*
> *indemnify and hold harmless* [MetroPCS] and its officers and
> directors (each, an **"Indemnified Party"** and, collectively, the
> **"Indemnified Parties"**) from and against any loss, damage, or
> liability, including reasonable costs and attorney fees, *to the extent*
> *that such loss, damage or liability arises out of any third-party*
> *claim, suit, or allegation that [MetroPCS'] use or sale of any*
> *Product or Services pursuant to the terms of this condition*
> *infringes the patent,* trademark, copyright rights, trade secret
> rights of [sic] other proprietary rights of such third party
> (collectively the **"IP Claim"**). . . . (Emphasis added)[11]

16.    Federal Plaintiffs' Federal Court Action is an "IP Claim" as defined under Section

7.4 (IP Claims) of the E9-1-1 Agreement. Federal Plaintiffs' patent infringement allegations

arise out of MetroPCS' "use or sale" of TCS' wireless enhanced 9-1-1 technology—the precise

service MetroPCS contracted for under the E9-1-1 Agreement.

17.    On October 21, 2008, MetroPCS sent TCS a notice informing TCS of the Federal

Court Action, Federal Plaintiffs' allegations that TCS' enhanced 9-1-1 service and technology

provided by TCS infringes the Patents, and demanding that TCS defend, indemnify and hold

harmless MetroPCS in accordance with the E9-1-1 Agreement.[12] In doing so, MetroPCS fully

complied with its obligation under Section 7.5 (Indemnity Procedure) of the E9-1-1 Agreement

to provide TCS with "prompt written notice of any IP Claim for which it seeks

indemnification."[13]

18.    On November 5, 2008, TCS responded to MetroPCS admitting that the Federal

Court Action "alleges infringement based upon providing E9-1-1 service that is used to meet the

---

[11] E9-1-1 Agreement, Section 7.4 (IP Claims) at p. 5.

[12] October 21, 2008 letter from J. Christopher Luna, Staff Vice President and Assistant General Counsel for
MetroPCS, to Mark D. Johnson at TCS, a true and correct copy of which is attached hereto as Exhibit C.

[13] E9-1-1 Agreement, Section 7.5 (Indemnity Procedure) at p. 5.

75625504.5/10900293

FCC's Phase 1 and Phase II mandate," but disclaiming any obligation to defend, indemnify and hold harmless MetroPCS.[14]

19.     Consequently, TCS has failed to meet its contractual obligations under the E9-1-1 Agreement, and MetroPCS now files this arbitration requesting a declaratory judgment that TCS has an obligation to defend, indemnify and hold harmless MetroPCS in the Federal Court Action, an order that TCS specifically perform those obligations, compensation for any damages caused by TCS' breach of the E9-1-1 Agreement, and payment of any royalties or damages arising out of the Federal Court Action. If TCS fails to comply with its obligations MetroPCS will be harmed because MetroPCS will be required to retain counsel, spend money to defend against the Federal Court Action, and divert important management attention and other resources to the Federal Court Action, for which money damages would not be sufficient.

## V.
### CAUSES OF ACTION

*A.*  *Declaratory Judgment for TCS' Duty to Defend, Indemnify and Hold Harmless MetroPCS from the Federal Court Action*

20.     MetroPCS re-alleges and incorporates paragraphs 1 through 19 above as if fully set forth herein in support of its declaratory judgment cause of action.

21.     Under the E9-1-1 Agreement, MetroPCS contracted with TCS for the use and sale of TCS' wireless enhanced 9-1-1 service and technology. Under Section 7.4 (IP Claims) of the E9-1-1 Agreement, TCS expressly agreed to defend, indemnify and hold harmless MetroPCS from any third-party claims, allegations, and suits for patent infringement arising out of MetroPCS' use or sale of TCS' wireless enhanced 9-1-1 service and technology, which would

---

[14] November 5, 2008 letter from Bruce A. White, representative of TCS, to J. Christopher Luna, a true and correct copy of which is attached hereto as Exhibit D.

include Federal Plaintiffs' allegations that TCS' enhanced 9-1-1 service and technology infringe the Patents.

22.     Federal Plaintiffs filed the Federal Court Action alleging MetroPCS infringes the Patents by its use and/or sale of the TCS' enhanced 9-1-1 service and technology. MetroPCS promptly notified TCS of the Federal Court Action, the Federal Plaintiffs' allegations, and demanded that TCS defend, indemnify and hold harmless MetroPCS from the claims, allegations and damages alleged in the Federal Court Action. Therefore, MetroPCS has fulfilled its obligations under the E9-1-1 Agreement and a declaratory judgment that TCS has an obligation to defend, indemnify and hold harmless MetroPCS from the Federal Court Action should be entered.

**B.      Specific Performance of TCS' Obligation to Defend, Indemnify and Hold Harmless MetroPCS from the Federal Court Action**

23.     MetroPCS re-alleges and incorporates paragraphs 1 through 22 above as if fully set forth herein in support of its specific performance cause of action.

24.     Under the E9-1-1 Agreement, MetroPCS contracted with TCS for the use and sale of TCS' wireless enhanced 9-1-1 services and technology. Under Section 7.4 (IP Claims) of the E9-1-1 Agreement TCS expressly agreed to defend, indemnify and hold harmless MetroPCS from any third-party claims, allegations or suits for patent infringement arising out of MetroPCS' use or sale of TCS' wireless enhanced 9-1-1 service or technology, which would include Federal Plaintiffs' allegations that TCS' enhanced 9-1-1 services and technology infringes the Patents.

25.     Federal Plaintiffs filed the Federal Court Action alleging MetroPCS infringes the Patents by its use and/or sale of the TCS' enhanced 9-1-1 wireless service and technology. MetroPCS promptly notified TCS of the Federal Court Action and demanded that TCS defend, indemnify and hold harmless MetroPCS from the Federal Court Action. Therefore, MetroPCS

10

75625504.5/10900293

has fulfilled its obligations under the E9-1-1 Agreement and TCS should be ordered to defend, indemnify and hold harmless MetroPCS from the Federal Court Action.

**C.    *Breach of the E9-1-1 Agreement by TCS***

     26.    MetroPCS re-alleges and incorporates paragraphs 1 through 25 above as if fully set forth herein in support of its specific performance cause of action.

     27.    TCS is in breach of the E9-1-1 Agreement. Despite demand, TCS has failed and refused to defend, hold harmless, indemnify and otherwise dispose of the IP Claims made the subject of the Federal Court Action.

     28.    MetroPCS has fulfilled all obligations under the E9-1-1 Agreement. TCS remains in breach, however, and should be found in breach of the E9-1-1 Agreement. Consequently, MetroPCS requests an award of all damages, attorney's fees and costs flowing, directly or indirectly, from the breach of the E9-1-1 Agreement by TCS.

**D.    *Common-Law Indemnification***

     29.    MetroPCS re-alleges and incorporates paragraphs 1 through 28 above as if fully set forth herein in support of its common-law indemnification cause of action.

     30.    The Federal Plaintiffs sued MetroPCS for patent infringement allegedly resulting from MetroPCS' use and sale of enhanced 9-1-1 technology and services. The sole means by which MetroPCS provides enhanced 9-1-1 services to its customers is through the use of TCS' enhanced 9-1-1 technology and services purchased under the E9-1-1 Agreement. MetroPCS relies solely on TCS to provide TCS' enhanced 9-1-1 technology and services free from patent infringement claims.

     31.    Should MetroPCS be found liable to the Federal Plaintiffs for patent infringement in the Federal Court Action, MetroPCS alone would be required to extinguish such legal obligation to the Federal Plaintiffs. However, TCS and MetroPCS owe a common duty to the

11

Federal Plaintiffs not to infringe the Patents. Therefore, as the primarily responsible infringer and sole provider of the enhanced 9-1-1 technology and services to MetroPCS, TCS should be ordered to wholly indemnify MetroPCS from and against the Federal Court Action.

### D.    *In the Alternative, Common-Law Contribution*

32.    MetroPCS re-alleges and incorporates paragraphs 1 through 31 above as if fully set forth herein in support of its common-law contribution cause of action.

33.    The Federal Plaintiffs sued MetroPCS for patent infringement allegedly resulting from MetroPCS' use and sale of enhanced 9-1-1 technology and services. The sole means by which MetroPCS provides enhanced 9-1-1 services to its customers is through the use of TCS' enhanced 9-1-1 technology and services purchased under the E9-1-1 Agreement. MetroPCS relies solely on TCS to provide TCS' enhanced 9-1-1 technology and services free from patent infringement claims.

34.    Should MetroPCS be found liable to the Federal Plaintiffs for patent infringement in the Federal Court Action, MetroPCS alone would be required to extinguish such legal obligation to the Federal Plaintiffs. However, TCS and MetroPCS owe a common duty to the Federal Plaintiffs not to infringe the Patents. Therefore, as the primarily responsible infringer and sole provider of the enhanced 9-1-1 technology and services to MetroPCS, TCS should be ordered to provide contribution to MetroPCS in relative proportion to TCS' responsibility for the infringement of the Patents, if any.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, MetroPCS respectfully requests the following relief:

(i)    A declaratory judgment that TCS has an obligation to defend, indemnify and hold harmless MetroPCS from and against the Federal Court Action;

75625504.5/10900293

(                              (

(ii)     TCS be ordered to specifically perform its obligations under the E9-1-1
         Agreement, including its obligations under Section 7.4 (IP Claims);

(iii)    TCS be ordered to defend MetroPCS from and against the Federal Court
         Action;

(iv)     TCS be ordered to pay reasonable costs and attorneys' fees incurred by
         MetroPCS in its defense of the Federal Court Action;

(v)      TCS be ordered to indemnify and hold harmless MetroPCS from all loss,
         damage, or liability resulting from the Federal Court Action, if any;

(vi)     TCS be found in breach of the E9-1-1 Agreement and an award of all
         damages, attorneys' fees and costs flowing, directly or indirectly, from the
         breach of the E9-1-1 Agreement by TCS;

(vii)    TCS be ordered to pay any and all amounts, including royalties and
         damages, resulting from, arising out of, or in connection with the Federal
         Court Action, if any;

(viii)   In the alternative, TCS be ordered to provide contribution to MetroPCS in
         relative proportion to its responsibility for any and all amounts, including
         royalties and damages, resulting from, arising out of, or in connection with
         the Federal Court Action, if any; and

(iv)     MetroPCS be awarded all other and further relief to which it may be justly
         entitled.

                              Respectfully submitted,

                              FULBRIGHT & JAWORSKI L.L.P.

                              Matthew H. Kirtland
                              Md. State Bar No. 26089
                              801 Pennsylvania Avenue, N.W.
                              Washington, DC 20004-2623
                              Telephone: 202.662.0200
                              Facsimile: 202.662.4643

75625504.5/10900293

Brett C. Govett
State Bar No. 08235900
Shea R. Haass
State Bar No. 24055609
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone: 214.855.8000
Facsimile: 214.855.8200

ATTORNEYS FOR CLAIMANTS

14

75625504.5/10900293

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Claimants' Demand for Arbitration was served on Respondent on this the _10th_ day of March, 2009.

**_Via Certified Mail Return Receipt Requested_**
CSC – Lawyers Incorporating Service Company
7 St. Paul Street, Suite 1660
Baltimore, Maryland 21202

Shea R. Haass

75625504.5/10900293

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

AMERICAN ARBITRATION
ASSOCIATION
RECEIVED
MAR 1 0 2009
CCMC

| Name of Respondent<br>TeleCommunication Systems, Inc. | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| Address<br>275 West Street | | | Name of Firm (if applicable) | | |
| | | | Representative's Address | | |
| City<br>Annapolis | State<br>MD | Zip Code<br>21401- | City | State | Zip Code |
| Phone No.<br>410.263.7616 | | Fax No.<br>410.263.7617 | Phone No. | | Fax No. |
| Email Address: | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated _____ April 11, 2003 _____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
Contract dispute regarding right to indemnification and defense arising out of allegations and claims in EMSAT Advanced Geo-Location Technology, LLC et al. v. MetroPCS Communications, Inc. et al., Civil Action No. 2:08cv381 (E.D.Tex.).

| Dollar Amount of Claim $>75,000.00 | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest<br>☒ Arbitration Costs ☐ Punitive/ Exemplary ☒ Other Performance |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $10,000.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Intellectual property background; telecommunications industry

Hearing locale ___ Annapolis, Maryland ___ (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| Estimated time needed for hearings overall:<br><br>_____ hours or _1_____ days | Type of Business: Claimant ___ Telecommunications Provider ___<br><br>Respondent Enhanced 911 Service Provider |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA ☒ Dallas, TX ☐ East Providence, RI ☐ Fresno, CA ☐ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)   Date:<br>Brett C. Govett w/permission SRM   3/10/09 | Name of Representative<br>Brett C. Govett |
|---|---|
| Name of Claimant<br>MetroPCS Communications, Inc.; MetroPCS Wireless, Inc. | Name of Firm (if applicable)<br>Fulbright & Jaworski L.L.P. |
| Address (to be used in connection with this case)<br>2250 Lakeside Boulevard | Representative's Address<br>2200 Ross Avenue, Suite 2800 |

| City<br>Richardson | State<br>TX | Zip Code<br>75082- | City<br>Dallas | State<br>TX | Zip Code<br>75201- |
|---|---|---|---|---|---|
| Phone No.<br>214.570.5800 | | Fax No. | Phone No.<br>214.855.8000 | | Fax No.<br>214.855.8200 |
| Email Address: | | | Email Address:<br>bgovett@fulbright.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the A.A.A. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879

# EXHIBIT "A"

## E9-1-1 NETWORK SERVICES AGREEMENT

This Agreement, dated as of April 11, 2003, is made by and between TeleCommunication Systems Inc, a Maryland corporation ("TCS"), having a principal place of business at 275 West Street, Annapolis, Maryland 21401 and MetroPCS Georgia, Inc. or MetroPCS California/Florida, Inc., Delaware corporations ("CUSTOMER") both having a principal place of business at 8144 Walnut Hill Lane, Suite 800, Dallas, TX 75231. The parties agree as follows:

### Section 1.    Relationship of the Parties

1.1    **Appointment.**  CUSTOMER hereby appoints TCS, and TCS hereby accepts appointment, as CUSTOMER's agent solely for purposes of this Agreement. CUSTOMER will make use of and deploy TCS technical solutions to provide wireless enhanced 9-1-1 services ("the TCS E9-1-1 Services") throughout its present markets. However, CUSTOMER retains the option to deploy other solutions, if required in order to satisfy federal, state or local regulations for E9-1-1 services. Except as expressly authorized in this Agreement, TCS will not enter into any agreements or undertakings for or on behalf of CUSTOMER without CUSTOMER's prior written consent.

1.2    **Designated Representatives.**  Promptly after the execution of this Agreement, each party will designate in writing an individual to represent such party in the administration of the Services and this Agreement. Further, CUSTOMER will designate, and have in place at all times during the Term, a separate individual to represent CUSTOMER in connection with the performance of the Services in each market. Either party may change its designated representatives from time to time by giving written notice of such change to the other party.

### Section 2.    The Services

2.1    **Scope and Performance.**  TCS will use reasonable efforts to perform for CUSTOMER the TCS E9-1-1 Services, as set forth in Phases I and II Service Descriptions, [attached hereto as Exhibit B and the Hosted PDE Services Supplement and made a part of this Agreement,] for each public safety answering point ("PSAP"), requesting from the CUSTOMER such services on such activation date (the "PSAP Activation Date"). This Network Services Agreement includes the services as described above and covers deployment of a Phase I and Phase II solution and the ongoing provisioning of intelligent routing, data delivery to the PSAP and related operational support required to deliver FCC-compliant Phase I and Phase II service. In order to enable Phase II service, CUSTOMER must select a Position Determination Equipment vendor ("PDE"), if other than TCS. The scope of effort and the associated costs of the integration of such PDE into TCS' E9-1-1 services solution will be covered in a separate Exhibit. TCS will not be responsible for implementation delays or service degradations that are not within its control including, without limitation, implementation delays or service degradations caused by CUSTOMER (including a failure by CUSTOMER to notify TCS of a Valid PSAP Request) or any PSAP, Local Exchange Carrier ("LEC"), SS7 signaling provider, PDE (if other than TCS) or interconnecting communications carrier; provided that any PSAP Activation Date that is affected by such an implementation delay shall be extended to take such delay into account.

2.2    **Addition or Deletions of Markets or PSAPs.**  As specified in Paragraph 1.1 above the parties may from time to time by mutual agreement add/or delete Markets and PSAPs subject to this Agreement.

2.3    **Cooperation and Assistance.**  CUSTOMER will cooperate with TCS by providing such information and will furnish to TCS all information (e.g. subscriber counts) and assistance expressly required to be provided by CUSTOMER in the Services Description. Without limitation of the foregoing, CUSTOMER will provide TCS with access to technical personnel and information in connection with performance of the Services and will furnish all information and assistance required to be provided by CUSTOMER under the Services Plan. Further, TCS and CUSTOMER will cooperate with each other in conducting any field tests and trials that TCS reasonably determines are necessary or desirable to ensure the performance and reliability of the TCS E9-1-1 Services. CUSTOMER will promptly notify TCS of any defect, deficiency or error known to or discovered by CUSTOMER.

2.4    **Network Equipment and Software.**  Title to communications equipment installed by TCS on the premises of any PSAP in connection with the performance of the Services, including without limitation the Frame

Relay Access Device ("FRAD") and Communications Service Unit/Digital Service Unit ("CSU/DSU"), will remain with TCS. Title to all software provided by TCS and used by CUSTOMER, TCS or the PSAPs in connection with the Services (the "Software") will remain at all times with TCS. CUSTOMER acknowledges that all intellectual property rights in and to the Software are and will remain the property of TCS. CUSTOMER will not reverse engineer, decompile, disassemble or attempt to reconstruct, identify or discover any source code, underlying ideas or algorithms of TCS software or intellectual property.

## Section 3.    Compensation

**3.1    Amounts.** For each PSAP deployment, CUSTOMER will pay to TCS a Services Fee in the amount shown in Exhibit A - Rate Schedule or Hosted PDE Services Supplement for each calendar month of service provided pursuant to this Agreement, commencing as provided in the respective state administrative rules or as agreed between CUSTOMER and the appropriate state or local administrative body, but in no case later than the activation of the service. Such Services Fee will be charged in full for any partial calendar month of service provided. The Rate Schedule covers the cost of a standard TCS E9-1-1 solution. Non-standard solutions, if required, will be detailed in an addendum to Exhibit A, or the Hosted PDE Services Supplement.

**3.2    Billing.**

**3.2.1** Subject to Exhibit A, TCS, as the CUSTOMER's agent, will (a) bill appropriate state and local agencies for fees due to the CUSTOMER for the provision of wireless enhanced 9-1-1 services; and (b) collect such fees on behalf of CUSTOMER; and (c) retain such fees as full payment for the provision of the TCS E9-1-1 Services (the "Services Fees"). Upon request by TCS, CUSTOMER will provide reasonable assistance to TCS with respect to cost justification as required for reimbursement by applicable state and local agencies.

**3.2.2** CUSTOMER retains the option to act as its own agent in billing and collecting from appropriate state agencies, in which case TCS would deliver bills directly to CUSTOMER in accordance with Exhibit A. CUSTOMER will give 90 day prior written notice to TCS if this option is to be exercised.

**3.3    Payment.**

**3.3.1** If payment for the full amount of an invoice submitted by TCS in accordance with Section 3.2.1 is not received by TCS within the time for payment specified by the applicable state or local agency for its cost recovery mechanism (or within 60 days after the date of such invoice if no such time is specified), then upon request by TCS, CUSTOMER will reasonably cooperate with and assist TCS in collecting the amounts due from the applicable state or local agency by taking such steps as CUSTOMER would reasonably take on its own behalf in order to collect such amounts for CUSTOMER's own account. The Service Fees collected by TCS shall be TCS' compensation hereunder, and CUSTOMER will be liable to TCS, if TCS does not receive payment within 120 days from the date of the original invoice, for payment due from the applicable PSAP or any other state or local agency or emergency services fund. Solely to the extent permitted by the applicable state or local agency in connection with its cost recovery mechanism for wireless enhanced 9-1-1 services, TCS shall be entitled to seek all remedies (including, without limitation, interest on late payments and cancellation of service to the applicable PSAP) that would be reasonably available to CUSTOMER for failure to receive payments on a timely basis from the applicable PSAP, state or local agency, or emergency services fund. Any amount not paid by the applicable state or local agency or CUSTOMER will bear interest at the rate of twelve percent (12%) per annum or the highest rate permitted by applicable law, whichever is less, computed and compounded daily beginning from sixty (60) days from the original date due until the date paid. Payment of such interest will not excuse or cure any breach of or default for late payment. When payment is received by TCS from the public safety entities and the TCS service fees and any related costs have been deducted in accordance with Exhibit A, any remaining balance not remitted to CUSTOMER will bear interest at the rate of twelve percent (12%) per annum or the highest rate permitted by applicable law, whichever is less, computed and compounded daily beginning from sixty (60) days from the payment receipt date by TCS until the date the balance is remitted to CUSTOMER.

**3.3.2** In the event payment for the full amount of each invoice submitted by TCS under Section 3.2.2 is not received by TCS within thirty (30) days of the applicable invoice date, CUSTOMER will pay the full amount of such invoice without offset and without regard to whether CUSTOMER receives funding to make such payment from the applicable PSAP or any other state or local agency or emergency services fund. Any amount not paid by CUSTOMER will bear interest at the rate of twelve percent (12%) per annum or the highest rate permitted by

applicable law, whichever is less, computed and compounded daily beginning from ninety (90) days from the original date due until the date paid. Payment of such interest will not excuse or cure any breach of or default for late payment.

3.4    **Taxes.** The compensation and other amounts payable to TCS under this Agreement do not include any sales, use, excise or other applicable taxes, and it excludes taxes based on TCS' income. CUSTOMER will pay applicable taxes in a timely manner or reimburse TCS on demand for, the full amount of all such taxes, including any late charges attributable to CUSTOMER. CUSTOMER will cooperate with TCS to minimize any such tax liability and CUSTOMER will provide upon demand a Resale Exemption Certificate, if applicable.

## Section 4.    Term and Termination

4.1    **Term.** Unless otherwise terminated by either party in accordance with the provisions set forth in this Agreement, the term of this Agreement shall commence on the Effective Date and shall expire three (3) years thereafter (the "Initial Term"); provided that upon expiration of the Initial Term, this Agreement will automatically renew for successive one-year periods (each a "Renewal Term") unless one party provides to the other party a written notice of non-renewal at least 60 days prior to the expiration of the Initial Term or the then-current Renewal Term. The Initial Term and the Renewal Terms, if any, shall be collectively referred to herein as the "Term." In the event CUSTOMER desire to holdover service after this Agreement terminates, TCS agrees to do so for a period of no longer than six (6) months at a services fee equal to one hundred thirty percent (130%) of the services fee in effect at the time of the holdover.

4.2    **Termination for Cause.** If either party breaches a material term of this Agreement, and such party fails to cure the breach within thirty (30) days following its receipt of written notice from the non-breaching party (or ten (10) days, in the case of payment defaults), then the non-breaching party, in addition to any other remedies it may have at law or in equity, may terminate the Agreement upon written notice to the breaching party.

4.3    **Other Termination.** TCS may, upon written notice to CUSTOMER, immediately terminate this Agreement if the Federal Communication Commission ("FCC") or any other regulatory agency promulgates any rule, regulation, judgment or order that (a) prohibits or substantially impedes (in effect or application) TCS from fulfilling its obligations under this Agreement or (b) has a material adverse effect on TCS's ability to conduct its business upon terms and conditions reasonably acceptable to TCS.

4.4    **Effect of Termination.** Upon any expiration or termination of this Agreement, all amounts owing to TCS hereunder will be immediately due and payable. If the CUSTOMER terminates this Agreement, at any time during the initial three (3) year period of the Agreement, except for a material breach, the CUSTOMER shall pay TCS a termination fee equal to $300,000.

4.5    **Survival.** Sections 2.1, 2.4, 3.3, 3.4, 4.1, 4.4, 4.5, 5, 6.3, 7, 8 and 9 and the Hosted PDE Services Supplement (together with all other provisions of this Agreement that may reasonably be interpreted or construed as surviving termination) will survive the termination of this Agreement.

## Section 5.    Confidentiality

5.1    **Confidential Information.** As used in this Agreement, "Confidential Information" means any information of either TCS or CUSTOMER that is not generally known to the public, whether of a technical, business or other nature including, but not limited to, trade secrets, know-how and information relating to the technology, cell sites, customers (e.g., subscriber counts), business plans, promotional and marketing activities, finances and other business affairs.

5.2    **Use and Disclosure.** In the performance of or otherwise in connection with this Agreement, either party (the "Receiving Party") may receive certain Confidential Information of the other party (the "Disclosing Party"). The Receiving Party, except as expressly provided in this Agreement or as necessary to perform its obligations under this Agreement, will not disclose such Confidential Information to any third party or use, or permit others to use, such Confidential Information for any purpose other than the purpose for which it was disclosed without the Disclosing Party's prior written consent. Without limiting the generality of the foregoing, the Receiving Party will not use such Confidential Information for any competitive or commercial purpose other than emergency

services. The Receiving Party will take reasonable measures to avoid disclosure, dissemination or unauthorized use of such Confidential Information, including, at a minimum, those measures it takes to protect its own confidential information of a similar nature.

     5.3    **Exceptions.** The provisions of Section 5.2 will not apply to any information that (a) is or becomes publicly available without breach of this Agreement, (b) was known to the Receiving Party at the time of its receipt from the Disclosing Party, (c) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortious act, (d) is independently developed by the Receiving Party without reference to any Confidential Information of the Disclosing Party, (e) is required to be disclosed by process of law or by any regulatory authority, or (f) is used or disclosed with the prior written consent of the Disclosing Party. If the Receiving Party is required to disclose any of the Disclosing Party's Confidential Information due to process of law or otherwise as required by any regulatory authority, the Receiving Party will provide written notice thereof to the Disclosing Party prior to making such disclosure.

### Section 6.   Warranties

     6.1    **Warranty.** TCS warrants to CUSTOMER that the TCS E9-1-1 Services will conform in all material respects to any (a) applicable performance requirements set forth in the Services Descriptions and (b) applicable rules and regulations promulgated by the FCC with respect to FCC Order 94-102 related to Phases I and II wireless E9-1-1 service. Unless provided by TCS, this warranty expressly excludes requirements related to location precision, which remains the responsibility of the carrier and designated PDE vendor(s).

     6.2    **Remedies.** If any Services fail to conform to the warranty set forth in Section 6.1, and CUSTOMER notifies TCS of such nonconformance in writing within thirty (30) days after the date of such nonconformance, TCS shall use reasonable efforts to correct such nonconformance. If TCS fails to correct such nonconformance within thirty (30) days of notification by CUSTOMER, CUSTOMER may terminate the Agreement upon three (3) business days' written notice to the breaching party.

     6.3    EXCLUSIVITY OF REMEDIES. TCS MAKES NO REPRESENTATIONS OR WARRANTIES WITH REGARD TO THE TCS E9-1-1 SERVICES OR OTHER ITEMS FURNISHED UNDER THIS AGREEMENT EXCEPT AS SET FORTH IN SECTION 6.1. THE REMEDIES OF CUSTOMER UNDER SECTION 6.2 ARE THE SOLE AND EXCLUSIVE REMEDIES OF CUSTOMER UNDER THIS AGREEMENT. EXCEPT AS PROVIDED IN SECTION 6.2, TCS DISCLAIMS AND CUSTOMER WAIVES AND RELEASES ALL RIGHTS AND REMEDIES OF CUSTOMER AND ALL WARRANTIES, OBLIGATIONS AND LIABILITIES OF TCS, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO THE SERVICES OR OTHER ITEMS FURNISHED UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### Section 7.   Indemnification

     7.1    **Acknowledgement.** CUSTOMER and TCS acknowledge their intent that TCS, in its performance of the TCS E9-1-1 Services, enjoy the same immunity from or limitation of liability as is available to CUSTOMER and its agents under applicable law, provided that (a) the provisions of Section 7.2 will not apply to the extent that any of the applicable claims, losses, harm, costs, liabilities, damages or expenses (including, without limitation, reasonable attorneys' fees) arose out of or in connection with any act or omission of gross negligence or willful misconduct by TCS or its employees, agents or representatives; and (b) the provisions of Section 7.3 will not apply to the extent that any of the applicable claims, losses, harm, costs, liabilities, damages or expenses (including, without limitation, reasonable attorneys' fees) arose out of or in connection with any act or omission of gross negligence or willful misconduct by CUSTOMER or its employees, agents or representatives. To the fullest extent permitted by applicable law, the foregoing indemnity will apply regardless of any fault, negligence, strict liability or product liability of TCS in connection with the provision of standard or enhanced 9-1-1 services.

     7.2    **Indemnity by Customer.** Subject to Section 7.1, CUSTOMER will defend, indemnify and hold harmless TCS (and its directors, officers, employees, representatives, agents and third party vendors) from and against any and all claims, losses, harm, costs, liabilities, damages and expenses (including, without limitation, reasonable attorneys' fees) arising out of or in connection with any act or omission of gross negligence or willful misconduct by CUSTOMER or its employees, agents or representatives in the operation of any wireless

communications service (including, without limitation, any cellular, PCS, SMR, PDE mobile satellite, air-to-ground, pager or other radio common carrier system). Upon CUSTOMER's written request, TCS will provide reasonable assistance in the defense of such claims.

   7.3    **Indemnity by TCS.**  Subject to Section 7.1, TCS will defend, indemnify and hold harmless CUSTOMER (and its directors, officers, employees, representatives, agents and third party vendors) from and against any and all claims, losses, harm, costs, liabilities, damages and expenses (including, without limitation, reasonable attorneys' fees) arising out of or in connection with (a) any act or omission constituting gross negligence or willful misconduct by TCS or its employees, agents, or representatives; or (b) TCS' gross negligence or willful misconduct in the performance of the TCS E9-1-1 Services or its other obligations under this Agreement (including, but not limited to, any failure of TCS' equipment, any failure to properly install or maintain TCS' equipment, or any other act or omission of gross negligence or willful misconduct of its directors, officers, and third party vendors with respect to the TCS E9-1-1 Services under this Agreement). Upon TCS' written request, CUSTOMER will provide reasonable assistance in the defense of such claims.

   7.4    **IP Claims.**  Subject to CUSTOMER'S compliance with the terms of this Section 7.4 and Sections 7.5 and 7.6, TCS shall defend, indemnify and hold harmless CUSTOMER and its officers and directors (each, an "**Indemnified Party**" and, collectively, the "**Indemnified Parties**") from and against any loss, damage, or liability, including reasonable costs and attorney fees, to the extent that such loss, damage or liability arises out of any third-party claim, suit, or allegation that CUSTOMER'S use or sale of any Product or Service pursuant to the terms of this condition infringes the patent, trademark, copyright rights, trade secret rights of other proprietary rights of such third party (collectively the "**IP Claim**"). TCS shall be entitled to solely control the defense of any such IP Claim with attorneys of its choice, and shall solely control the disposition of any such IP Claim. CUSTOMER shall not be entitled to any defense, indemnification or the like under this Section to the extent any such IP Claim arises out of CUSTOMER'S unauthorized use, negligent use, or misuse of any Product or Service.

   7.5    **Indemnity Procedure.**  CUSTOMER shall provide TCS with prompt written notice of any IP Claim for which it seeks indemnification hereunder. TCS shall (i) keep each Indemnified Party advised of the status of any such IP Claim and of its defense and/or negotiation efforts, (ii) afford such Indemnified Party a reasonable opportunity to review and comment on dispositive actions planned to be taken by TCS on behalf of such Indemnified Party, and (iii) take all steps that TCS deems reasonably necessary to effectively defend the IP Claim. Each Indemnified Party shall, at TCS' expense, reasonably cooperate with TCS in the defense of such Indemnified Party.

   7.6    **IP Claim Infringement Remedy.**  If the use, manufacture, or sale of any Product or Service furnished hereunder becomes subject to an IP Claim, TCS shall, at TCS' option and at no expense to the CUSTOMER, (i) by license or other release from claim of infringement obtain for the CUSTOMER the right to make, use, sell, and/or import into the United States the Product or Service, as appropriate; (ii) substitute an equivalent non-infringing Product or Service reasonably acceptable to the CUSTOMER, which meets the Specifications for the Product, and extend this indemnity thereto; or (iii) modify such Product or Service to make it non-infringing but continue to meet the Specifications therefore, and extend this indemnity thereto.

**Section 8.    Limitations of Liability**

   NEITHER PARTY WILL BE LIABLE TO THE OTHER (OR ITS DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, CUSTOMERS OR ANY OTHER THIRD PARTY) FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE SERVICES OR SUCH PARTY'S PERFORMANCE OF OR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. EXCEPT FOR AMOUNTS PAYABLE BY CUSTOMER TO TCS UNDER SECTION 3, EACH PARTY'S LIABILITY (WHETHER IN TORT, CONTRACT OR OTHERWISE AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), PRODUCT LIABILITY OR STRICT LIABILITY OF SUCH PARTY) UNDER THIS AGREEMENT OR WITH REGARD TO THE SERVICES OR OTHER ITEMS FURNISHED UNDER THIS AGREEMENT WILL NOT EXCEED THE TOTAL COMPENSATION ACTUALLY PAID TO TCS FOR THE PREVIOUS TWELVE MONTHS UNDER SECTION 3 OR $100,000, WHICHEVER IS GREATER.

**Section 9.      Miscellaneous**

9.1      **Force Majeure.**  Neither party will be liable for, or be considered to be in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement to the extent caused or contributed to by any condition, circumstance, event or occurrence beyond its reasonable control (including, without limitation, any failure of a PSAP or LEC to cooperate in connection with the implementation of TCS E9-1-1 Services). If any such delay occurs for a given PSAP, the applicable Activation Date will be extended solely to the extent that such delay was caused or contributed to by such condition, circumstance, event or occurrence.

9.2      **Settlement of Disputes.**  A senior executive of either party may, upon notice to the other party of a dispute arising out of or related to this Agreement or within five (5) business days after receipt of a notice from the other party of a dispute arising out of or related to this Agreement, elect to utilize a non-binding resolution procedure whereby each party presents its position at a hearing before a panel consisting of one senior executive of each of the parties and, if such senior executives can agree upon such an individual, a mutually acceptable neutral advisor. If a party elects to use the procedure set forth in this Section, the other party shall participate in good faith. The hearing shall occur no more than ten (10) business days after either party notifies the other party of its election to use the procedure set forth in this Section. If such senior executives cannot resolve the matter, the neutral advisor, if any, may be asked to assist such senior executives in evaluating the merits of each party's position. The parties shall each bear their respective costs incurred in connection with the procedure set forth in this Section, provided that the parties shall each be responsible for one-half of the costs, fees and expenses of the neutral advisor, if any, and any facility required for the hearing. If elected, the procedure set forth in this Section 9.2 shall be used prior to employing any other alternative dispute resolution procedures including those set forth in Section 9.3.

9.3      **Arbitration.**  If a claim, dispute or controversy (a "Dispute") arises out of or relates to this Agreement, or its breach, and the parties have not been successful in resolving such Dispute through negotiation or the use of the procedures described in Section 9.2, the Dispute will be decided by arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules, and such arbitration shall be held (a) in Annapolis, Maryland. Each party shall bear its own expenses (including attorney's fees) and an equal share of the expenses of the arbitrator and the fees of the AAA. The parties, their representatives, other participants and the arbitrator shall hold the existence, content and result of the arbitration in confidence. In the event of arbitration, judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction. Either party may, without inconsistency with this arbitration provision, apply to any court having jurisdiction hereof and seek interim provisional, injunctive or other equitable relief until the arbitration award is rendered or the controversy is otherwise resolved. Notwithstanding any choice of law provision included in this Agreement, the United States Federal Arbitration Act shall govern the interpretation and enforcement of this arbitration provision.

9.4      **Notices.**  Any notice or other communication under this Agreement will be in writing and will be delivered in person, by facsimile, or mailed, properly addressed and stamped, to the intended recipient at the address appearing on the signature page of this Agreement. Notices shall be deemed received only upon actual receipt. Either party may change its address by giving the other party notice of the change in accordance with this paragraph.

**As to CUSTOMER:**
MetroPCS, Inc
8144 Walnut Hill Lane, Suite 800
Dallas, TX 75231
Attention: Dennis Spickler, VP CFO
Telephone: 214-265-2584
Facsimile: 972-860-2606

**As to TCS:**
TeleCommunication Systems Inc.
275 West Street
Annapolis, Maryland 21401
Attention: Contracts

Telephone 410-263-7616
Facsimile: 410-263-7617

**9.5     No Waiver.** The failure of either party to insist upon or enforce strict performance by the other of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver or relinquishment of its right to assert or rely upon any provision or right in that or any other instance, and such provision or right will remain in full force and effect.

**9.6     Assignment.** Except as otherwise expressly provided in this Agreement, neither party shall have the right to assign its rights or delegate its duties under this Agreement without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld. CUSTOMER may assign this Agreement, and all rights, benefits, liabilities and obligations hereunder to any person or business entity which is licensed by the FCC to operate a wireless communications business, is a parent, general partner, or subsidiary of CUSTOMER, controls or is controlled by or under common control with CUSTOMER, is merged or consolidated with CUSTOMER, or purchases a majority or controlling interest in the ownership or assets of CUSTOMER, or which acquires all or substantially all of the assets of CUSTOMER (for purposes of this Agreement, a "Successor"), or any entity which obtains a security interest in a substantial portion of CUSTOMER assets. CUSTOMER agrees to provide written notification of such assignment not later than thirty (30) days before such assignment occurs. The terms and conditions of this Agreement shall inure to the benefit of and be enforceable by the respective Successor. Any attempted assignment or delegation in contravention of this Section shall be null and void and shall be grounds for immediate termination.

**9.7     Publicity.** No press releases or other public announcements of or relating to this Agreement shall be made by either party without the prior mutual written consent of the other party unless required by law or regulatory authority. CUSTOMER consents to the use of CUSTOMER's name in TCS customer and/or partner lists.

**9.8     Audit.** TCS shall maintain and shall retain for a period of not less than two years after the termination or expiration of this Agreement (a) complete and accurate books and records of, and supporting documentation for, all amounts collected on behalf of CUSTOMER hereunder; and (b) complete and accurate operational documentation regarding TCS' compliance with the warranty set forth in Section 6.1. Upon fourteen days' prior written notice from CUSTOMER to TCS (or such shorter notice period as may be authorized by applicable law, rule or regulation in connection with an audit to be performed by a governmental entity) during the Term and for a period of up to two years after the termination or expiration of this Agreement, TCS shall allow CUSTOMER's independent audit firm (or such authorized governmental entity) to access such books, records and documentation for purposes of conducting an audit (including, without limitation, making copies of such books, records and documentation), and CUSTOMER shall be responsible for all expenses (except for any costs or expenses incurred by TCS) associated with such audit. Subject to the foregoing, CUSTOMER may conduct such an audit no more than once per year, provided that such limitation shall not apply to audits performed by any such authorized governmental entity. TCS will cooperate with CUSTOMER's independent audit firm and any such authorized governmental entity in connection with the performance of any such audit.

**9.9     Counterparts.** This Agreement may be executed in counterparts, which together will form one agreement.

**9.10     Governing Law.** This Agreement shall be construed and enforced in accordance with the Laws of the State of Delaware without regard to its conflicts of laws provisions. Subject to Sections 9.2 and 9.3, the venue for any action brought by CUSTOMER hereunder shall be the federal or state courts located in Delaware.

**9.11     Entire Agreement.** This Agreement, together with the attached Exhibits and Hosted PDE Services Agreement, which are incorporated herein by this reference, sets forth the entire agreement of the parties, and supersedes any and all prior agreements, related to the Services. No change, amendment, or modification of any provision of this Agreement will be valid unless set forth in a written instrument signed by both parties.

IN WITNESS WHEREOF, The parties have executed this Agreement on the date first above written.

TeleCommunication Systems Inc.:

By: _Richard A. Young_

Printed: _Richard A. Young_

Title: _Executive V.P. and C.O.O._

Address:    275 West Street
            Annapolis, MD 21401

CUSTOMER:

By: _Malahm M. Lorang_

Printed: _Malcolm M. Lorang_

Title: _VP & CTO_

Address: _2144 Walnut Hill Lane,
          Suite 600 Dallas TX 75231_

## EXHIBIT A

### Rate Schedule Offering for E9-1-1 NETWORK SERVICES AGREEMENT

#### Phases I and II - FCC Order 94-102

#### Services Fee:

$650.00 per PSAP per Month                    Based upon a three year agreement


The service fee does not include costs for services or solutions that have not been identified in the Services Description. Prior to billing, the parties will mutually agree upon the amount of any such unforeseen costs.

If a non-standard ALI interface solution is required (i.e., an ALI interface solution other than the standard ALI interface solution set forth in the Services Description), the parties shall mutually agree upon an adjustment to the Services Fees to include the increased costs, if any, associated with such non-standard ALI interface solution.

Service fee does not include any additional carrier costs and is subject to any applicable tax.

# EXHIBIT B

The Wireless E9-1-1 Phase 1 and Phase II Service Description commences on the following pages.

TCS CONFIDENTIAL

## Hosted PDE Services Supplement

This Hosted PDE Services Supplement ("**Supplement**") is executed and entered into this 11th day of April 2003 (the "*Effective Date*"), by and between TeleCommunication Systems, Inc., a Maryland corporation with a place of business at 275 West Street, Annapolis, Maryland 21401 ("*TCS*"), and MetroPCS Georgia, Inc. or MetroPCS California/Florida, Inc., Delaware corporations both with a place of business at 8144 Walnut Hill Lane, Suite 800, Dallas, TX 75231 ("*CUSTOMER*").

WHEREAS, CUSTOMER entered into an E9-1-1 Network Services Agreement dated April 11, 2003 with TCS (the "Agreement") for the provision of Phase I E9-1-1 services; and

WHEREAS, TCS has developed and implemented a hosted Position Determining Entity (PDE) service (the "PDE Service") that provides connectivity between the PDE and Mobile Positions Center (MPC) for the delivery of the Phase II E9-1-1 required messaging across an interface between the two; and

WHEREAS, the parties wish to supplement the E9-1-1 Network Services Agreement to provide for the purchase the Hosted PDE Service.

NOW, THEREFORE, in consideration of the terms and conditions set forth below, and subject to the terms and conditions of the Agreement, TCS and CUSTOMER agree as follows:

### Section 1.   TCS RESPONSIBILITIES

**Deliver PDE Functionality for CUSTOMER Wireless E 911 Phase II Solution:** TCS will provide the PDE Service to CUSTOMER using SnapTrack Location Server Software (or greater depending on general release and availability) supporting the appropriate gpsOne, IS801.1 and J-STD-036 message detail.

**Hosting of PDE Service Bureau:** TCS will host the SnapTrack PDE solution in its data centers. TCS will be responsible for monitoring and maintaining the PDE, including managing software updates as provided by STI.

**Connectivity from PDE to MPC:** TCS will be responsible for connectivity between the PDE and TCS' MPC. TCS will be responsible for passing appropriate PDE-associated messaging across standard interfaces (including the E5 and E3 as defined in the J-STD-036). Connectivity from the CUSTOMER to the MPC (e.g. the E3 interface) is not covered as part of this service. This connectivity is addressed separately as part of the TCS Xypoint Wireless E9-1-1 services.

**Base Station Almanac Maintenance:** TCS will host the Base Station Almanac (BSA) database and ensure that the database and data within it work in compliance with the SnapTrack PDE.

**Training:** TCS will provide "train-the-trainer" training to CUSTOMER personnel relative to CUSTOMER's operations, utilizing TCS' standard training program. See Schedule 4—Hosted PDE Training for more details.

**Documentation:** TCS will provide reasonably required documentation as mutually agreed with the CUSTOMER relating to the PDE Service. See Schedule 5—Hosted PDE Documentation for more information.

**TCS Testing of SnapTrack Commercial Software Releases:** TCS will integrate and test each SnapTrack software release in its data centers, before activating that release in hosted services provided to CUSTOMER.

**Product Maintenance and Support:** TCS shall maintain 7x24x365 monitoring and shall provide the first line technical support for the TCS SnapTrack PDE Service Bureau, as described in Schedule 6—Hosted PDE Service Support and Software Maintenance. SnapTrack will provide Level 2, 3 and 4 technical support to TCS and CUSTOMER. TCS shall monitor the system, handle system maintenance, and will ensure a consistent and high level of operation of the Hosted PDE Service for CUSTOMER's commercial use. TCS shall be responsible for all incident management, problem escalation and resolution, and any routine maintenance or upgrades to the system.

TCS will work directly with the CUSTOMER and SnapTrack to isolate and diagnose anomalies with the Hosted PDE Services. TCS shall be solely responsible to implement any and all necessary solutions TCS shall cause SnapTrack to provide technical assistance and software revisions as appropriate, with TCS managing the delivery of CUSTOMER and service bureau system requirements to SnapTrack.

**Business and Products Review Meetings:** The Parties will meet on a regular basis to review product roadmap, engineering and product support issues.

**Additional Technical Support:** TCS is available to provide CUSTOMER with additional technical support in areas not covered by this Supplement on a time-and-materials basis, at the rate stated in Schedule 1.1.

Section 2.    CUSTOMER RESPONSIBILITIES

**Assignment of Personnel:** CUSTOMER will assign personnel sufficient to receive operations training during the integration period. The assigned personnel shall have sufficient technical knowledge in operating mode to understand how the PDE Service interacts with CUSTOMER's wireless network and to perform the appropriate monitoring activities.

**Providing BSA Information:** In accordance with procedures defined by TCS, the CUSTOMER shall provide information contained within the Base Station Almanac and ensuring the accuracy of the information provided. The CUSTOMER shall provide updates and additions to this information. The CUSTOMER shall notify TCS of the addition of new cell sites prior to their activation and shall provide the associated BSA information.

**Connectivity to the TCS MPC:** The CUSTOMER shall maintain connectivity to TCS' MPC as defined in the Agreement.

**Cell Site Calibration:** The CUSTOMER shall execute all Cell Site Calibration activities required for the BSA and provide the information to TCS (such as Antenna Latitude/Longitude, Maximum Antenna Range, Antenna Orientation, etc.). TCS can help with these activities, but they are not covered under the PDE Services.

**MSC Maintenance and Updates:** The CUSTOMER shall ensure that all switches are updated to the appropriate software load.

**GPS-enabled Handsets:** Shall acquire and distribute GPS-enabled handsets. Handsets that follow the IS-801-1 standard are compatible with the SnapTrack PDE.

**Acceptance Test:** CUSTOMER shall participate in acceptance testing related to the integration of the PDE Service into the CUSTOMER's wireless network in accordance with the TCS Acceptance Test Plan. In the event that the service does not pass the Acceptance Test Plan criteria, CUSTOMER shall notify TCS in writing. TCS shall work the problem until it meets the Acceptance Test Plan criteria.

**Service Monitoring and Support:** CUSTOMER shall maintain appropriate monitoring and internal procedures to allow for advance notification to TCS and, when necessary, immediate escalation, when changes or malfunctioning in its network cause changes or degradation in the PDE Service.

In accordance with procedures defined by TCS the CUSTOMER shall be responsible for maintaining the elements within its wireless networks that are required for the Hosted PDE Service. The CUSTOMER shall coordinate system changes, cell site additions, and updates to the BSAs. The CUSTOMER shall also be responsible for notifying TCS of any network issues that may affect the Hosted PDE service.

**Business and Products Review Meetings:** The Parties will meet on a regular basis to review, product roadmap, engineering and product support issues.

Section 3.    PRICE AND PAYMENT

The Price for the PDE Services and the payment terms are provided in Schedule 1.

C:\Documents and Settings\ringer\My Documents\2011\TCS New Contract\Final Contract\Metro TCS Hosted PDE E911 Supple. Orig.
041103_accepted.doc                                                              Page 2 of 14
                                                                          TCS CONFIDENTIAL

**Section 4.     TERM**

This Supplement shall be effective on the Effective Date herein, and shall continue in effect thereafter for a period of three (3) years, unless otherwise terminated or modified by either party in accordance with the provisions set forth in the Agreement. At the end of the Term, this Supplement will automatically renew for successive periods of one (1) year, unless either party notifies the other party in writing at least sixty (60) days prior to the end of the Term.

**Section 5.     ASSIGNMENT**

This Agreement may not be assigned or transferred by the CUSTOMER without the prior written consent of TCS hereto, which will not be unreasonably withheld, except that the CUSTOMER may assign this Agreement without consent to any parent, affiliate or wholly owned subsidiary. In addition, the CUSTOMER's rights under this Agreement may be assigned or transferred without the consent of TCS to (1) a successor in interest of Customer's entire business or substantially all of its assets, who assumes the obligations of this Agreement, or (2) to any of its lenders for collateral security purposes. No service bureau work, multiple-user license, or time-sharing arrangement is permitted, except as expressly authorized by TCS.

**Section 6.     PUBLICITY**

No press releases or other public announcements of or relating to this Supplement shall be made without the prior mutual written consent of each party unless required by law or regulatory authorities. CUSTOMER consents to the use of CUSTOMER's name in TCS customer and/or partner lists.

**Section 7.     MISCELLANEOUS**

Any waiver or modification of this Supplement shall not be effective unless executed in writing and signed by an authorized representative of TCS and CUSTOMER. The Agreement and this Supplement, together with all of the Schedules hereto, constitute the complete and entire agreement between the parties regarding the PDE Services and supersede any prior agreements or understandings between the parties with respect to its subject matter, and shall be construed in accordance with the substantive laws of the State of Maryland. Neither party has the authority to bind or obligate the other party in any manner.

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first written above.

**TeleCommunication Systems, Inc.**                    **CUSTOMER**

By: _____                    By: _____
(Authorized Signature)                              (Authorized Signature)

Name/Title: Richard A. Young, Executive V.P. & C.O.O    Name/Title: MALCOLM LORANG

Hosted PDE Services Supplement

SCHEDULE 1

PRICING AND PAYMENT

The price for the Hosted PDE Services is as follows:

One-Time Set-Up Fee

CUSTOMER shall pay to TCS a one-time set-up fee of $4,000 per PSAP, which shall be invoiced upon the PSAP activation date.

Monthly Recurring Fee

There will also be a monthly recurring fee in which TCS, as the CUSTOMER's agent, will (a) bill appropriate state and local agencies for fees due to the CUSTOMER for the provision of wireless enhanced 9-1-1 services; and (b) collect and retain such fees on behalf of CUSTOMER. Upon request by TCS, CUSTOMER will provide reasonable assistance to TCS with respect to cost justification as required for reimbursement by applicable state and local agencies.

TCS' monthly fee of $1,000.00 per PSAP is based upon a three year contract.

Fees will be invoiced on a monthly basis and payment is due within thirty (30) days of the invoice date. If payment for the full amount of an invoice submitted by TCS in accordance with Section 3.2 is not received by TCS within the time for payment specified by the applicable state or local agency for its cost recovery mechanism (or within 60 days after the date of such invoice if no such time is specified), then upon request by TCS, CUSTOMER will reasonably cooperate with and assist TCS in collecting the amounts due from the applicable state or local agency by taking such steps as CUSTOMER would reasonably take on its own behalf in order to collect such amounts for CUSTOMER's own account. The Service Fees collected by TCS shall be TCS' compensation hereunder, and CUSTOMER will be liable to TCS, if TCS does not receive payment within 120 days from the date of the original invoice, for payment due from the applicable PSAP or any other state or local agency or emergency services fund. Solely to the extent permitted by the applicable state or local agency in connection with its cost recovery mechanism for wireless enhanced 9-1-1 services, TCS shall be entitled to seek all remedies (including, without limitation, interest on late payments and cancellation of service to the applicable PSAP) that would be reasonably available to CUSTOMER for failure to receive payments on a timely basis from the applicable PSAP, state or local agency, or emergency services fund. Any amount not paid by the applicable state or local agency or CUSTOMER will bear interest at the rate of twelve percent (12%) per annum or the highest rate permitted by applicable law, whichever is less, computed and compounded daily beginning from sixty (60) days from the date of the original date due until the date paid. Payment of such interest will not excuse or cure any breach of or default for late payment. When payment is received by TCS from the public safety entities and the TCS service fees and any related costs have been deducted in accordance with Exhibit A, any remaining balance not remitted to CUSTOMER will bear interest at the rate of twelve percent (12%) per annum or the highest rate permitted by applicable law, whichever is less, computed and compounded daily beginning from sixty (60) days from the payment receipt date by TCS until the date the balance is remitted to CUSTOMER.

The CUSTOMER will be responsible for any fees not covered under the Cost Recovery and Billing processes as defined in the Wireless E9-1-1 Service Description.

**Services Not Covered in the SnapTrack PDE Service upfront or monthly fees:**

Pricing provided for the SnapTrack PDE Service includes all deployment and maintenance activities associated with the SnapTrack PDE Service except the following:

- CUSTOMER is responsible for all elements within their network including, but not limited to, ensuring the appropriate software and switch load is installed on their switch, switch translations, messaging provided from their network, connectivity, and subscriber handsets.
- CUSTOMER is responsible for providing all information related to their cell sites, calibration of these sites, and maintenance of this information; this information is defined in the document "gpsOne™ Base Station Almanac Specification"; the CUSTOMER must also provide information for any modifications, additions or deletions to the BSA; CUSTOMER is responsible for ensuring this information is accurate and up to date; TCS will provide any tools or data they reasonably can to assist in refining and validating that data.
- CUSTOMER is responsible for obtaining and configuring data, which includes gathering, verifying and formatting the data; any drive testing required for cell site calibration, which includes initial deployment of the system; drive testing will require an individual to place calls and record the latitude and longitude for this call; TCS will assist with this process by providing call information generated by the PDE software.
- CUSTOMER is responsible for timely notification to TCS of any modifications to their network that may affect PDE service and working with TCS to resolve any system issues within the CUSTOMER's network that are the result of these modifications.

Any work beyond that which has been described above shall be provided in a written statement of work and agreed to by both parties. The quote for any additional effort will be at the then current prices on a time and material basis.

**Additional Consulting Services and Technical Support:** $150.00 per hour. Additional reasonable expenses for other direct charges, such as travel, will be reimbursed at cost.

Hosted PDE Services Supplement

## SCHEDULE 2

### LIST OF CUSTOMER CONTACT PERSONS

**Operations/Connectivity:**

Main Contact: Ron Unger                          Title:   Member of Technical Staff

Phone/Fax:   972-860-2622                         Email:  runger@metropcs.com

Alternate:    Malcolm Lorang                      Title:   VP and CTO

Phone/Fax:   214-265-2553                         Email:  mlorang@metropcs.com

**Reporting:**

Main Contact: Ron Unger                          Title:   Member of Technical Staff

Phone/Fax:   972-860-2622                         Email:  runger@metropcs.com

Alternate:    Malcolm Lorang                      Title:   VP and CTO

Phone/Fax:   214-265-2553                         Email:  mlorang@metropcs.com

Other Contact Type: _____

Main Contact: _____            Title: _____

Phone/Fax: _____               Email: _____

Alternate: _____               Title: _____

Phone/Fax: _____               Email: _____

Hosted PDE Services Supplement

SCHEDULE 3

Hosted PDE Services Description

TCS will be hosting and maintaining the SnapTrack PDE software solution on its Service Bureau. TCS will be responsible for providing the connectivity between the MPC and PDE and the delivery of the required messaging across an interface between the two.

## SnapTrack's PDE

SnapTrack's PDE software provides the Position Determination Entity (PDE) functionality within a hybrid GPS-network assist architecture. The purpose of the PDE software is to monitor the GPS satellite constellation, process and store the GPS reference data received, utilize existing network infrastructure knowledge of the wireless subscriber, provide assistance data to the mobile subscriber terminal, and, in some cases, to calculate the location (latitude, longitude, etc.) of the Mobile Station (MS).

SnapTrack's PDE supports both the Wireless Assisted GPS (WAG) solution as well as the use of network information (Base Station Almanac data and Round Trip Delay information) and MS information (AFLT) to increase the yield of position determination in solving for the mobile subscriber's position. Base Station Almanac information is utilized to increase the accuracy of the initial position of the mobile subscriber as well as to improve the yield of position determination. This information is used to customize the assistance information and can help increase the yield (percentage of time a position fix is computed) for a wireless location system. Cooperation and coordination with the infrastructure vendors is required for support of this feature.

Advance Forward Link Trilateration (AFLT, i.e. the support of Pilot Phase Measurement Message reported by the MS) is also supported within the SnapTrack PDE. The use of AFLT can substantially improve the performance of a WAG location system. AFLT is supported within the Qualcomm MSM3300 chipset as well as other chips moving forward.

## SnapTrack PDE Architecture

The SnapTrack PDE Software supports positioning related functions for mobile stations within a wireless network. Support can come in many forms, but typically consists of supplying GPS aiding data (Satellite vehicle ID, Doppler, Ephemeris, Almanac, etc.) and, in some modes, computing the mobile station's position.

SnapTrack's PDE software supports several modes of operations; all based on wireless communications standards. The modes of operations are configurable by TCS, as well as determined based on the mobile station's capabilities.

- Network Server Assist, PDE Position Determination - In this mode, the PDE provides assistance data to the mobile station (Base Station Almanac data from the wireless network, and AFLT information from the mobile station, if available). SnapTrack's PDE receives GPS Pseudo-range data determined by the mobile station and computes the final position. The position is optionally sent to the mobile station if the mobile station requests the position. This mode is supported by IS-801-1 and SnapTrack's LS-GS interfaces.

- Network Server Assist, Mobile Station Position Determination - In this mode, the PDE provides assistance data to the mobile station (including the utilization of Base Station Almanac data from the wireless network, and AFLT information from the mobile station, if available). The mobile station computes its own position. The position is optionally sent to the PDE software if the network based application requests the position be sent back to the network. This mode is supported by the IS-801-1 interface.